**FILED**

MAY 0 1 2015

**Clerk, U.S. District & Bankruptcy**
**Courts for the District of Columbia**

1
Veronica W. Ogunsula, Pro Se
4723 Morning Glory Trail
2
Bowie, Maryland  20720
240-486-1427
3
Nona.Ogunsula@gmail.com

4
IN THE UNITED STATES DISTRICT COURT

5
FOR THE DISTRICT OF COLUMBIA

6
| | |
|---|---|
| VERONICA W. OGUNSULA, | Case No.: |
| | |
| Plaintiff, | |
| | |
| vs. | OGUNSULA VS. ERIC HOLDER ET AL. |

7

8

9

10
ERIC H. HOLDER, JR., in his individual capacity as U.S.
Attorney General, Department of Justice, (DOJ)
11
James B. Comey, in his individual capacity as Director, Federal
Bureau of Investigation, Washington, DC
12
Thomas E. Perez, individually and as the former Assistant
Attorney General, Civil Rights Division, DOJ
13
H. Marshall Jarrett, individual and as former Director, U.S.
Attorneys' Office, DOJ
14
Michael E. Horowitz, individually and in his capacity as the
Inspector General, (DOJ)
15
Joseph S. Campbell, in his individual capacity as the Deputy
Assistant Director, Criminal Investigative Division, FBI
16
Sandra A. Bungo, in her individual capacity as the Unit Chief,
Initial Processing Unit, Internal Investigations Section,
17
Inspections Division, FBI
18
Rod Rosenstein, individually, U.S. Attorney for Maryland,
Baltimore, Maryland
19
Bryan E. Foreman, individually and in his official capacity as the
former Assistant U.S. Attorney, Greenbelt Maryland
20
Thomas Coyle, individually and in his official capacity as an
Agent, FBI Baltimore, Maryland
21
Stephen E. Vogt, in his individual capacity as the Special Agent
In Charge, FBI Baltimore, Maryland
22
Sharon Marcus-Kurn, individually, U.S. Attorney's Office,
Washington, D.C.
23
David Abramowitz, individually and in his capacity as the Vice
President, Humanity United, Washington, DC
24
Derrick Nutall, individually and in his official capacity as the
Pastor & New Bethel Baptist Church, Washington, DC
25
Bishop Neavelle Coles, in his capacity as the Jurisdictional
Bishop of the D.C. Jurisdiction, Church of God In Christ,
26
Washington, D.C.
27
Glen F. Ivey, individually and in his official capacity as the
28
former State's Attorney, Prince George's County Maryland

Case: 1:15-cv-00668
Assigned To : Unassigned
Assign. Date : 5/1/2015
Description: Pro Se Gen. Civil (F)

RECEIVED

APR 2 2 2015

U. S. District & Bankruptcy
Courts for the District of Columbia

1   Franklin Shelton, Prosecutor, Prince George's County Maryland
    Renee Battle Brooks, Prosecutor, Prince George's County Office
2   of the State's Attorney
    Angela Alsobrooks, in her individually as the State's Attorney,
3   Prince George's County Maryland Government
    Prince George's County Health Department, Largo, Maryland
4   Michael Lanier, Detective, Greenbelt Maryland Police
5   Department
    Mark A. Magaw, in his individually as Chief, Prince George's
6   County Maryland Police
    Fraternal Order of Police, National Headquarters
7   Vernon R. Herron, individually and in his capacity as the former
    Deputy Chief Administrative Officer, Public Safety and Director
8   of Homeland Security, Prince George's County Government
    Gwendolyn T. Clerkley of Prince George's County Maryland
9   Government;
    Montora Mays of Prince George's County Maryland
10  Government
    Paul and Crystal Scott, Bethesda, Maryland;
11  Lisa A. Owens, Bowie, Maryland
    Robert J. Williams, Sr., individually and in his capacity as the
12  Pastor & St. Paul Baptist Church, Capitol Heights, Maryland
    John K. Jenkins & First Baptist Church of Glenarden, Landover,
13  Maryland
    Fannie Mae, Washington, DC
14  Mike Torrey, Long & Foster
    Geesing/BWW Law GroupJohn Doe
15  Jane Doe
    Mike Torrey, Long and Foster
16  Geesing/BWW Law Group, LLC.
17

18                              Defendants
19

20                              COMPLAINT
21

22  NOW COMES Plaintiff, Veronica W. Ogunsula, a United States citizen, proceeding Pro Se complaining

23  of Defendants, Eric H. Holder, Jr., Attorney General of the United States; Thomas E. Perez, former

24  Assistant Attorney General, Civil Rights Division, United States Department of Justice; H. Marshall

25  Jarrett, former Director, Executive Office of the United States Attorneys; Michael E. Horowitz, Inspector

26  General, U.S. Department of Justice; Joseph S. Campbell, Deputy Assistant Director, Criminal

27  Investigative Division, FBI Headquarters; Sandra A. Bungo, Unit Chief, Initial Processing Unit, Internal

28
    OGUNSULA VS. ERIC HOLDER ET AL. - 2

Investigations Section, Inspection Division, Federal Bureau of Investigation; Amy Jo Lyons, former

Special Agent In Charge, Baltimore Maryland FBI Field Office also former Assistant Director,

Inspections Division, Federal Bureau of Investigations, Glen Ivey, former State's Attorney, Prince

George's County Maryland; Angela Alsobrooks, State's Attorney, Prince George's County Maryland;

Franklin Shelton, Prosecutor, Office of the State's Attorney, Prince George's County Maryland; et al.

INTRODUCTION

1. The Plaintiff brings this suit pursuant to Title 42 U.S.C., Section 1983 for violations of certain

   protections guaranteed to her by the First, Fourth, Fifth, Sixth, Seventh, Eighth, Thirteenth, and

   Fourteenth Amendments of the United States Constitution committed by the Defendants acting

   under color of law.

2. Plaintiff brings this suit pursuant to Title 42 U.S.C., § 1985, as well as Title 28 U.S.C., § 1343

   pursuant to which this court has jurisdiction over Plaintiff's claims alleging conspiracy to

   interfere with her civil rights.

3. Plaintiff brings this suit pursuant to Title 42 U.S.C., § 1986 pursuant to which this court has

   jurisdiction over Plaintiff's claims alleging conspiracy to interfere with her civil rights, that

   certain defendants had fore knowledge of the conspiracies listed in Section 1983 and1985, and

   having power to prevent or aid in preventing the commission, failed or refused to act or intercede;

4. Plaintiff brings this suit pursuant to Title 42 U.S.C. § 1994 pursuant to which this court has

   jurisdiction over Plaintiff's claims alleging conspiracy to the hold the plaintiff to service or labor

   under the system known as peonage which is abolished and forever prohibited in any Territory or

   state of the U.S.

5. Plaintiff bring this suit pursuant to Title 42 U.S.C., § 1988 pursuant to which this court, having

   jurisdiction over the Plaintiff's Sections 1983 and Section 1985 claims, has the authority to hold

   the Defendants liable for costs incurred by the Plaintiff in proceedings in vindication of her civil

   rights, which liability extends to judicial officers.

6.  Plaintiff brings this suit pursuant to Title 18 U.S.C., § 1512 and 1513, relating to tampering with a witness, victim, or an informant, pursuant to which this court has jurisdiction over Plaintiff's claims alleging that certain defendants engaged in criminal activity conspiracy to intimidate Ms. Ogunsula as a witness in a 2001 sexual assault case in Prince George's County Maryland; certain defendants engage in actions to intimidate and retaliate against Ms. Ogunsula for filing a False Claims Act complaint with the FBI and continuing to provide information regarding criminal activities in the furtherance of a cover-up of that claim.

7.  Plaintiff asserts that Defendants in this action are either federal or state actors and/or are "willful participants in joint activity with the Federal or its agents," and as such are deemed to be federal and state actors for the purpose of this Section 1983 complaint. Adickes v. Kress & Co., 398 U.S. 144, at 152 (1970).

8.  Plaintiff asserts that Defendants subverted the judicial process and in so doing knowingly and intentionally inflicted injury and summary judgment on the Plaintiff including circumstances that amount to detention, loss of income and property and emotional, physical, and psychological harm. Title 42 U.S.C. § 1983 specifically provides remedies against "those private persons who participate in subverting the judicial process and in so doing inflict injury on other persons." Dennis v. Sparks, 449 U.S. 24, 27 (1980). As in Dennis, in the matter at hand, the defendants had entered into a corrupt agreement to perform a judicial act. "Private person, jointly engaged with state officials in a challenged action, are acting under color of law."

9.  Plaintiff asserts that Defendants in this action jointly participated with state officials in unlawfully seizure of Plaintiffs' property. "[A] private party's joint participation with state officials in the seizure of disputed property is sufficient to characterize that party as 'state actor' for purposes of Fourteenth Amendment." Lugar v. Edmondson Oil Co., Inc., 457 U.S. 922 (1982).

## JURISDICTION AND VENUE

10. Plaintiff claims federal jurisdiction pursuant to Article III, Section 2, which extends the jurisdiction to cases arising under the U.S. Constitution and 28 U.S.C. § 1331. Venue is proper under 28 U.S.C. ~ 1391(b).

BACKGROUND

11. In a July 2012 letter to Mr. Horowitz, Inspector General of the U.S. Department of Justice, Ms. Ogunsula provided details of her contact with personnel from the FBI Field Office and the United States Attorney's Office, both in Baltimore, Maryland, regarding activities that were criminal in nature and took place during and after her employment with Prince George's County Government in Largo, Maryland from April 2005 to May 2012. The document provided details of her contact with United States Department of Justice (DOJ) personnel and management escalations that took place to request an investigation of evidence of retaliation, civil rights violations, a conspiracy against rights, racketeering, corruption and a cover –up by members of law enforcement, public officials, government employees in Prince George's County, Maryland and the State of Maryland, and private individuals, some acting in concert with law enforcement/government officials.

12. In addition to providing information to Mr. Horowitz that she had previously provided to or offered to provide to federal law enforcement, Ms. Ogunsula provided to Mr. Horowitz new evidence of a conspiracy against rights and egregious civil rights violations.

13. The letter also included details of at least two suspicious thefts of both personal and work-related information that the plaintiff offered to support evidence of a conspiracy. The thefts occurred while the plaintiff worked for Prince George's County Government.

14. Both federal and local law enforcement personnel repeatedly acted to thwart an investigation in an effort to: 1) cover-up criminal activities including felonies, retaliation, witness intimidation, racketeering, and egregious civil rights violations that deprived Ms. Ogunsula of rights

guaranteed to her in the U.S. Constitution and 2) protect former or current law enforcement personnel and public officials.

15. Further, the actions and failure to intercede by Federal Law Enforcement officials, namely Eric H. Holder, Jr., Thomas Perez, James B. Comey, Joseph S. Campbell, Bryan T. Foreman, Thomas Coyle, Sandra A. Bungo, Stephen E. Vogt and Sharon Marcus-Kurn aided and abetted parties who committed unlawful acts and civil rights violations under Title 42 U.S.C., § 1983, 1985, 1994 and other racketeering violations under 18 U.S.C. § 1962 including 18 U.S.C. § 1512, 1513. The RICO violations, excluding Section 1512 and 1513 claims, will be pled in a separate complaint.

Statement of Factual Allegations

16. In February 2005, Gwen Clerkley, then Deputy Health Officer of Prince George's County Health Department (PGHD), approached Ms. Ogunsula to request a referral for a project manager to manage a U.S. Department of Homeland Security Urban Area Security Initiative (UASI) Grant that had been awarded to PGHD. She described the project as a build out of a microwave network. Ms. Ogunsula recommended Deanna Barnes Butts of Washington, D.C., a Howard University classmate and sorority sister, who had past experience in telecommunications.

17. When Ms. Barnes declined the job, Ms. Clerkley pitched the position to Ms. Ogunsula as a part-time position that she could do and still maintain her non-profit organization/work as well as her musician/music administration position. Ms. Clerkley recommended Ms. Ogunsula to Mr. Frederick Corder, M.D., who was at that time the Health Officer of Prince George's County Maryland Government. Ms. Ogunsula interviewed with Dr. Frederick Corder and Mr. John Donohue, the then Operations Manager at Maryland Institute of Emergency Medical Services Systems (MIEMSS) in Baltimore, Maryland. Mr. Donohue was the co-sponsor of a proposal that resulted in the award of the $4.5M (total) in federal grant to Prince Georg's County Government between 2005 and 2007. Mr. Donohue had been offered the project manager position for the

federal grant by Dr. Corder, but he had declined the offer to come work for Prince George's County Government.

18. Ms. Ogunsula was extended and accepted an offer as the Program Manager of the Patient Tracking Program. Ms. Ogunsula had over 10 years of prior experience working for a Fortune 50 telecommunications company, AT&T. She worked in AT&T's Federal Systems/Government Markets Division that provided telecommunications services and equipment to federal agencies and international governments. Ms. Ogunsula's experience includes billing associate on complex system integrator contracts, sales and marketing of domestic and international communications/data network services to federal agencies and international governments, new business development and project management. Ms. Ogunsula holds a Bachelor of Business Administration degree from Howard University, Masters of Business Administration degree from the University of Pittsburgh, and a certification in Federal Marketing/Federal Acquisition Regulation from George Washington University. She was offered a salary not to exceed $85,000/year and was told that she could set her own hours. She was also informed that she was not expected to work a 40 hour week; however, it was her responsibility to fulfill the project management responsibilities of the federal grant. Ms. Ogunsula's first day of work was April 1, 2005. She attended a few meetings before the first day of work at Ms. Clerkley's request.

19. After two candidates recommended by Ms. Clerkley do not accept a Program Assistant position, Ms. Ogunsula hired Monica Whitaker, a former co-worker from AT&T, in June 2005. Ms. Whitaker's experience included administrative support to senior executives, managing and reporting business and financial results, and managing administrative support professionals.

20. In September 2005, Gwen Clerkley, who is then the Acting Health Officer, verbally directs Ms. Ogunsula to send an Emergency Request For Proposal (RFP) for the Patient Tracking System (PTS) to a limited number of vendors using the fact that The County would be providing direct

services (e.g., shelter, medical services, social services, etc.) to over 400 New Orleans, Louisiana residents who had been displaced because of Hurricane Katrina.

21. The following companies had previously made a presentation regarding the capabilities of their Patient Tracking system/services to a regional group of health and medical stakeholders from the Washington, D.C. area (National Capital Region) and were sent a copy of the above mentioned RFP:

      i.    EMSystems, LLC., Madison, Wisconsin

      ii.    Salamander Technologies, Inc., Travers City, Michigan

      iii.    Disaster Management Solutions, Torrance, California

      iv.    Global Emergency Resources, Atlanta, GA

Although being given very little support to prepare the RFP by Health Department procurement staff, Ms. Ogunsula had the forethought to include The County's standard (procurement) Terms & Conditions in the Emergency procurement documentation sent to vendors. This Terms & Conditions document was key to the County's ability to terminate a vendor for non-performance under this specific Emergency RFP.

22. Ms. Ogunsula later finds out during an internal investigation conducted by The County's Office of Law (investigation led by the late David Leibowitz, Esq., Deputy County Attorney) that Ms. Clerkley did not follow proper procedures and that she did not have authority to release a "Request For Proposal". Ms. Ogunsula had sought out the assistance of The County's Office of Central Services' Office of Procurement and Contracts and Office of Information Technology as well as the Health Department's Procurement staff to prepare procurement documents for the services needed to fulfill the grant's requirement. However, she was discouraged from doing this by Ms. Clerkley who wanted to manage the procurement in-house (within the Health Department).

23. In December 2005, prior to the contract award, Ms. Ogunsula considered consulting The County's senior management (specifically, the Chief Administrative Officer-Jacqueline Brown)

about her concerns with the modified procurement and vendor selection process. However, she decided not to escalate her concerns because by this time The County's Offices of Law and Central Services seemed to be fully engaged.

24. In February 2006 after a full review, The County's Office of Central Services' authorized a contract award (i.e., purchase order) under the previously referenced RFP and federal grant funds to EMSystem LLC based on exigent circumstances. Salamander Technologies was their subcontractor. EMSystem provided the internet-based patient tracking solution and Salamander Technologies offered the mobile equipment and its associated software.

25. While on a trip to California in late March to visit her sister who was undergoing cancer treatment, Ms. Ogunsula's purse was stolen after attending services on Sunday, 3/26/06 at Greater Refuge Whittington Temple, 2001 73rd Avenue, Oakland, California 94605. Ms. Ogunsula filed a police report on 3/28/06 with the Oakland Police Department. Items stolen include her driver's license and other I.D., credit card, palm pilot, personal cell phone, bank cards and check books.

26. On approximately 4/07/06, Ms. Ogunsula's Gateway personal laptop hard drive was damaged at Prince George's County Health Department. The laptop included files regarding the Patient Tracking Project and procurement as well as personal files and emails. At this point, she is using her PC for the Patient Tracking Project (PTS) because she had not been issued a County laptop. Ms. Ogunsula had the laptop repaired and discovered that emails were missing from the 2004 to 2006 time period from both her personal and non-profit organization's email client accounts including emails related to the (PTS) Program.

27. During a conference call with EMSystem in May 2006, Ms. Clerkley instructed EMSystem to submit an invoice for all equipment and services related to the Patient Tracking Project so that they could be paid by the grant's deadline which now had been extended from the original date of October 1, 2005 to May 31, 2006. EMSystem complied with the request and submitted a two-line summary invoice for equipment and services associated with the Emergency RFP. The invoice

totaled almost $1 million which included the items that had not yet been physically delivered to Prince George's County Government and work not yet performed. Ms. Clerkley consistently put pressure on Ms. Ogunsula to pay the vendor's bills even though: 1) the vendor had billed for equipment that had not yet been delivered; 2) the billing lack sufficient detail to determine which services were being billed for; 3) the billing included services that had not been performed; and 4) the vendor could not meet The County's requirements to execute a contract.

28. Ms. Ogunsula reviewed the bill that Ms. Clerkley had requested of EMSystem on the aforementioned conference call and asked the EMSystem contact to resubmit the bill with line-item detail on the actual equipment and services that had been delivered. Although she had been instructed by Ms. Clerkley, who was now the Acting Health Officer of Prince George's County, to pay the new bill the vendor had provided which by now included line-item detail, she encountered problems executing the appropriate Health Department documents due to the vendor not being able to provide a valid Certificate of Insurance that was acceptable to the County's Office of Procurement and Contracts.

29. Even though a Grant Agreement had not been executed Ms. Clerkley instructed Ms. Ogunsula to go ahead and submit the paperwork for payment to EMSystem by submitting a payment request for her signature. Ms. Clerkley approved a partial payment based on a recommendation by Ms. Ogunsula which involved paying in full for all equipment that had been delivered and deemed agnostic by the program team. A payment of $410,050 (which was approximately 50-60 percent of the total outstanding charges to EMSystem) was certified and mailed to EMSystem, LLC. on August 11, 2006.

30. Ms. Ogunsula, of her own accord, sought out an existing Maryland state contract to make an approximately $2 million purchase of Microwave Networks, Inc. equipment that was needed to fulfill the federal grant requirements to expand a Maryland based public safety microware

communications network. The purchase was based on a network design provided and approved

by the project team's technical resources and County Management.

31. In September 2006, a Formal Customer Acceptance Test of the EMSystem provided

software/services portion of the PTS project was performed by stakeholders and a user group

comprised of public health, Medical and public safety personnel from the Washington, D.C.

metropolitan area. The test was developed by the PTS project team's technical resource, Dahyu

Patel based on the requirements set forth in the September 2005 RFP. The EMSystem product

failed in 16 of 22 areas.

32. A full investigation of the program, contractual agreements, and the vendor's performance was

conducted by the then Deputy County Attorney, the late Mr. David Leibowitz, between October

and November 2006. The Deputy County Attorney would eventually recommend that EMSystem

be given an additional Customer Acceptance Test opportunity in January 2007.

33. Mr. Andy Nunemaker, CEO of EMSystem, requested a meeting with Ms. Ogunsula at the Health

Department in Largo, Maryland on October 25, 2006, to discuss the following:

    i.    Status of Procurement/Request For Proposal (RFP)/Project

    ii.   Compliance Issues (Gaps)

    iii.  Contract (w/PGHD)

    iv.  Feedback on the September 2006 Customer Acceptance Test

    v.   EMSystem's request for payment

Prior to this meeting, Ms. Ogunsula had received a complaint from an end-user from Fairfax

County, Virginia Fire Department to complain about being contacted directly by EMSystem

employees to discuss the PTS project issues. Ms. Ogunsula contacted Mr. Nunemaker and

requested that EMSystem contact the program management office (PMO) to facilitate

communication about the PTS program with the program's end-users. During the October 2006

meeting, Mr. Nunemaker asked what would happen if EMSystem did not meet the contractual

requirements in all areas.  He also stated that EMSystem wanted to collect 70% of the outstanding

payment due.  Ms. Ogunsula suggested that he send a letter detailing his request along with a

response for the outstanding contract items.

34. Immediately after meeting with Ms. Ogunsula, Mr. Nunemaker had a private meeting with Ms.
    Clerkley.  According to statements made by Andy Nunemaker in an April 2008 meeting with
    Vernon Herron, Tracey Benjamin, County Counsel, and Ms. Ogunsula, Ms. Clerkley promised
    that EMSystem would be paid in full during the aforementioned October private meeting.

35. A previously planned formal live demonstration of the EMSystem solution took place during the
    2006 Marine Corps Marathon on October 29, 2006 under the direction of Arlington County Fire
    and Emergency Medical Service in Arlington, Virginia and the Medical Command of the Marine
    Corps Operations Team so that the solution could be evaluated in a live "planned" Mass Casualty.

36. On October 31, 2006, Ms. Clerkley directed Ms. Ogunsula to send Mr. Nunemaker an email
    stating that the County would pay 50% of the outstanding software costs upon invoice.  She
    complied with this request.

37. The EMSystem invoice was delivered to the office on or about November 20, 2006.  While
    reviewing the invoice, Ms. Ogunsula discovered that bill included equipment that had been
    previously billed and paid for.  While completing the bill verification/validation process, Ms.
    Ogunsula had to immediately leave town on a family medical emergency in California. While Ms.
    Ogunsula was away, Ms. Clerkley instructed Ms. Monica Whitaker, the Program Assistant, to pay
    the bill. Ms. Whitaker contacted Ms. Ogunsula, who was out of town visiting her sister who had
    been critically ill in the hospital, to get the appropriate information to complete the task. Ms.
    Ogunsula provided the information to Ms. Whitaker, however Ms. Whitaker communicated to Ms.
    Ogunsula that she did not feel she had enough background on the billing to complete the task. Ms.
    Ogunsula was due back in the office in 2-3 business days, so she told Ms. Whitaker that she

would complete the task when she returned to the office. Ms. Ogunsula contacted Mr. Nunemaker to notify him of the reason that The County's payment might be delayed a few days.

38. On December 13, 2006, Ms. Ogunsula provided to Ms. Clerkley a payment request document to approve a $115,207.25 payment for EMSystem. This payment was $10,000 less than the amount that had been previously billed on the invoice. The overbilling amount included equipment/services that had previously been invoiced by the vendor. Ms. Clerkley was not happy that the vendor was not being paid in full but acquiesced when she was provided documentation on the validated charges. This was not the only instance of overbilling by the vendor. This was in fact a common occurrence for this vendor on this program.

39. Based on the investigating County Attorney's recommendation, Ms. Clerkley extended EMSystem additional opportunities to demonstrate their solution's compliance and ability to meet the needs of the National Capital Region's (NCR) Health & Medical stakeholders in March and May 2007. During the March 27, 2007 Test, the vendor's server became unresponsive during the test and the test could not be completed. EMSystem provided an explanation for the System Outage and was extended a third Customer Acceptance Test opportunity on May 6, 2007. Although the May 2007 test showed some progress, results of the test and findings by the project team and user group indicated that there were still significant gaps in the vendor's solution.

40. On or about April 24, 2007 during a meeting with the Deputy County Attorney and Ms. Clerkley who participated in the meeting via telephone, Ms. Ogunsula was told by Mr. Leibowitz that her recollection of the facts concerning the program activities needed to coincide with Ms. Clerkley's recollection. He stated that '*we need to protect Gwen*'. Also Mr. Leibowitz raised his voice to indicate his displeasure with Ms. Ogunsula's truthful answers to questions about the PTS program and procurement that differed from Ms. Clerkley's responses. Ms. Ogunsula responded that the answers she was giving were in writing in the procurement documentation. Ms. Ogunsula was concerned about the Deputy County Attorney's tactics and alerted her new manager. Mr. Vernon

OGUNSULA VS. ERIC HOLDER ET AL. - 13

Herron. A new attorney, Ms. Tracy Benjamin, was assigned to the program. However, Ms. Benjamin was supervised by Mr. Leibowitz. After the second series of failed Customer Acceptance Tests by EMSystem, a second investigation of the PTS program was conducted by The County's Office of Law.

41. On or about May 17, 2007, Ms. Clerkley suddenly left her position at the Health Department. By this time she had resumed her position as the Deputy Health Officer.

42. The PTS project and Ms. Ogunsula were transferred to the Office of Homeland Security under Mr. Vernon R. Herron, Director of the Office of Homeland Security and the Deputy Chief Administrative Officer for Public Safety on or about April 30, 2007.

43. Her co-workers located at the Largo Office are:

- Mr. J. Lomax, Deputy Director, Office of Homeland Security
- Mr. E. Jones, EMS/Fire Department Liaison
- Mr. E. Walker, Emergency Preparedness
- Ms. M. Weatherly, Staff (Ms. Weatherly had formally worked at Health Department.)
- R. Holloway, Police Department Liaison

44. Sometime between May and June 2007, Ms. Ogunsula meets with Jacqueline F. Brown, Chief Administrative Officer, Vernon R. Herron, and Tracey Benjamin (Office of Law) at the County Administration Building in Ms. Brown's Office to provide an overview of the program. By this time, the EMSystem provided solution has failed all testing included the two testing opportunities extended in March and May 2007. A decision is made to move forward with terminating the EMSystem contract. During the meeting Ms. Brown made a statement that an investigation (conducted by the County) was underway at the Health Department. This statement was in relation to Gwen Clerkley's abrupt departure from the Health Department.

45. During the program's transition to the Office of Homeland Security from the Health Department in April and May 2007, Ms. Ogunsula had several disturbing encounters with Mr. Joseph Lomax:

1.  The first incident where Ms. Ogunsula encountered Mr. Joseph Lomax while visiting The County's Office of Homeland Security to survey the office location, he barked out a statement: "I heard about you." She was surprised at his comment and did not know what he is referring to. He repeats the statement again and she looked at him with a confused expression on her face and responded, "You'll find that I am a hard worker and very focused on the job I have to do." She was disturbed by Mr. Lomax's behavior and comments.

2.  In May 2007 when furniture movers arrive at the Office of Homeland Security to bring in Ms. Ogunsula's furniture and files from her former office at the Health Department. Mr. Lomax disagreed with the move and openly and loudly objects and tells the movers to stop moving the furniture into the office that Ms. Ogunsula and Mr. Herron had agreed to. He raised his voice and insisted that the movers stop what they are doing. The movers stop moving in the furniture and had to be rescheduled to complete the task because of Mr. Lomax's behavior and objections.

3.  A few weeks later another incident occurred when Mr. Lomax invited Ms. Ogunsula to a personal event he was having at his home. Mr. Lomax asked her about her family and whether she had a "significant other". She tells him that most of her immediate family is in California and that she is not currently dating anyone. He continues with questions describing the type of person he is referring to when he's says "significant other". It seems as if she is being interrogated. She repeats her previous answer, "I'm not dating anyone." As she leaves his office, she walks pass Muriel Weatherly's office and stops to talk to her about his inappropriate manner and line of questioning. Later, she informs Mr. Herron of the incident as well as Mr. Lomax's earlier inappropriate conduct and comments.

46. In May 2007, Andy Nunemaker of EMSystem placed at least two calls to Ms. Ogunsula to ask "what he could do" to resolve the contract situation. Mr. Nunemaker had been previously instructed to direct all of his communications to the Prince George's County Office of Law. She

OGUNSULA VS. ERIC HOLDER ET AL. - 15

did not feel comfortable with the tone of Mr. Nunemaker's inquiries and immediately notified Mr. Herron, Director of Public Safety, and Ms. Benjamin in the Prince George's Office of Law.

47. Also, sometime in June or July 2007, Ms. Ogunsula arrived home from work and noticed four young men in a green four-door car parked adjacent to her home. Later that day she finds out from a neighbor, Ms. Meads, that the young men had been asking her questions about Ms. Ogunsula. She had no knowledge of who the men were or why they would be inquiring about her. However the incident coincided with difficulties she was experiencing at work. She did not get the license plate number of the car they were driving because, at the time she notices them, she is not aware that they have asked questions about her. She does not find out about their questions until after she talked to her neighbor later that evening. As a victim of a sexual assault that occurred in October 2001 in Greenbelt, MD, she is concerned about the incident. At that time no suspect had been identified in sexual assault. She later provided this information to the Greenbelt Police Department and Prince George's County Office of the State's Attorney when she had conversations with them about the 2001 sexual assault. (2008-2009)

48. Also in May/June 2007, Ms. Ogunsula had to escalate to the County's senior management requests for information that is needed to complete the federal grant reports by the deadline when the Health Department's staff refused to provide her with the information.

49. In July 2007, Ms. Ogunsula does not receive a payroll check from Prince George's County, Maryland. Her paychecks were delayed by at least 30 days. The timing of the retaliation followed her speaking up about the PTS project, the failure of the EMSystem tests and Ms. Clerkley's sudden departure from the Health Department.

50. In June 2007, Ms. Ogunsula was contacted by other U.S. Department of Homeland Security grantees namely a Public Health manager and Emergency Medical Services senior managers from St. Louis, Missouri, San Francisco, California and Boston, Massachusetts who had also experienced significant problems with their EMSystem provided solution. The San Francisco,

California customer was moving toward terminating their contract with EMSystem. Ms. Ogunsula provided this information to Mr. Herron and Ms. Benjamin, County Attorney.

51. Ms. Ogunsula is told by Mr. Herron not to attend the PTS project team meetings in Washington, D.C.

52. On August 1, 2007, the EMSystem contract is officially terminated by The County.

53. Ms. Ogunsula received her first Prince George's County Maryland issued paycheck in August 2007 after not receiving a check in July. This check included a pay raise which had been agreed to in meetings/conversations with Mr. Herron in May 2007. The new salary was $125,000/year which was more competitive with the salaries of her regional peers and the full-time hours that was required to manage the program. Previous paychecks since April 2005 had been issued by the State of Maryland.

54. In June 2007, Mr. Herron called Ms. Ogunsula after a funding meeting with the Senior Policy Group (SPG)/Chief Administrative Officers (CAO) committee. During the phone call, he admitted to her that he had intentionally been untruthful in a meeting regarding the PTS project's funding request that he had presented to the SPG/CAO. This information contradicted the written information she had provided to the committee.  The discrepancy was formally discovered in November 2007 when a staff member from the State of Maryland's Emergency Management Agency contacted Ms. Ogunsula regarding the details of the funding proposal that had been approved.

55. After his presentation to the SPG/CAO committee, Mr. Herron in a phone conversation asked Ms. Ogunsula not to attend the program team meetings. He stated that the project team members would try to trip her up on information she had provided to them. She did not understand his stance and thought that her absence would be hard to explain to the program team, but she complied with his request. At this time, her personal services contract had not been executed and

she had not received approval to backfill program team (program assistant and technical support) members although her job requisition documents had been signed off on.

56. On September 11, 2007, there is a break-in at the Office of Homeland Security in Largo, Maryland.  Three laptops from the PTS Program are taken from Ms. Ogunsula's office including a laptop that had been used to manage the PTS program. It contained grant program data including billing information, test results, and inventory.  This laptop is taken out of its PC case in a cabinet located directly behind her desk.  The PC case is then zipped up and put back in the cabinet.  There was visible damage to the front door of the office.

57. In a staff meeting that was called the following day to discuss the break-in, Mr. Herron asked Ms. Ogunsula about the data that was on the stolen laptops.  She told him that there was procurement documents and program information on one of the laptops.  Mr. Herron also stated during the meeting that he had 'called in a favor' to keep the break-in out of the media.

58. After the meeting, Ms. Ogunsula also told him that she had back-up data of most of the stolen data on a USB drive.  He looked visibly surprised and uncomfortable with her statement.

59. A few days after the break-in, Ms. Weatherly, who was a staff person in the County's Office of Homeland Security and worked in the same office as Ms. Ogunsula in Largo, Maryland, asked Ms. Ogunsula if she could borrow the previously mentioned USB drive to transport a document to Mr. Herron. His office was at the County's Central Administrative Building in Upper Marlboro, Maryland.  Ms. Ogunsula declined her request and suggested Ms. Weatherly email the document to Mr. Herron. This is the first time that Ms. Ogunsula became suspicious and suspected foul play in the Largo office break-in. It seemed strange that Ms. Weatherly would ask for the USB drive. It was obvious to Ms. Ogunsula that someone wanted to see the information on her USB drive. Ms. Ogunsula also thought it strange that her managers would not ask her directly for the USB if they wanted to see it because the information on the USB was "work product". This data was also resident on her desktop computer.

60. In late November 2007, Ms. Ogunsula received an email from, Ms. Krista Horochena, a staff attorney at the Maryland Emergency Management Administration (MEMA) requesting clarification on the funding request that had been presented to the SPG/CAO committee in May/June. Her email confirmed what Mr. Herron had stated earlier about him providing mis-information about the funding request. After receiving the email, Ms. Ogunsula called Mr. Herron to discuss the email. Mr. Herron's remarked to Ms. Ogunsula during the phone conversation "we got caught". She was surprised at his comments because he had been the one to provide the mis-information to the committee. She let him know that she was uncomfortable with the impression left by the tone of the staff attorney's email. Ms. Ogunsula sent an email on 11/30/07 clarifying the details what had originally been requested in the funding proposal that had been provided to the regional executives. It included the previous communiqué, dated June 14, 2007, that listed the information that Ms. Ogunsula had verbally communicated to the committee. Both Mr. Herron and Ms. Horochena had been recipients of the earlier emails.

61. A few weeks later in December 2007, Ms. Ogunsula attended a church ministry Christmas Party at the home of one of the members in Bowie, Maryland. At the end of the party, as the members were verbally sharing prayer requests, she shared a prayer request regarding the situation with Mr. Herron and the emails referenced above. She believed the prayer time to be confidential and was very troubled that her boss had been dishonest and was involving her in the lie. One of the party attendees was an employee who worked in the County Administration Building in Upper Marlboro for one of Mr. Herron's peer. Ms. Ogunsula had really forgotten that the secretary was at the party until she began asking her questions about the request after the party. Although she did not verbally identify Mr. Herron by name, she was concerned because the secretary knew that Mr. Herron was her boss.

62. In January 2008, Ms. Ogunsula sent an email to Mr. McCollum, a personal attorney she was conferring with about the matter, stating that "things are pretty bad at work". She shared the

situation about Mr. Herron providing false information to a regional committee of executives responsible for funding her project as well as the aforementioned emails that exposed the untrue information. She stated that she felt isolated and her duties had been cutback.

63. On February 26, 2008, Ms. Ogunsula called and requested an unscheduled meeting with Mr. Herron and during that meeting she submitted a letter of resignation, effective immediately. She believed that she was being retaliated against both at work and through her non-profit organization, FOR THIS CAUSE, Inc. In partnership with The County's Health Department and Prince George's Community College, the organization had conducted an annual health awareness programs called TAKE THE CHALLENGE (TTC) from 2004-2008 led by Ms. Ogunsula's non-profit organization. Ms. Leslie Johnson, former First Lady of Prince George's County MD, had been the lead supporter and ambassador for the TTC program. The TTC program attendance suffered a steep declined in January and February 2008. It appeared that the issues with the County had negatively impacted the community health project and its attendance. Because of this and the problems of having no duties; the office break-in; the incident where Ms. Weatherly asked for her USB; being excluded from office team meetings; the tension in the office with Mr. Lomax; and the previous problems with getting paid, Ms. Ogunsula tendered her resignation. At meeting with Mr. Herron, she told him that she was concerned with the ethical issues that had taken place. She also told him that she had experience in federal procurement and that it was against the law to pay a vendor with federal funds for work that was subpar or had not been delivered. He asked her to take a few days off and rethink her decision. He intimated that he was not involved in any wrongdoing. She took a few days off and decided not to resign hoping things would be better.

64. In March 2008, the County reversed its original decision to terminate EMSystem and decided to move forward with them. EMSystem had contacted the County and communicated that they intended to file a Complaint against the County for non-payment based on the terminated contract.

They sent The County a complaint they said that they were prepared to file in court. The complaint alleged mismanagement by the County. Ms. Ogunsula reviewed the Complaint at the request of Mr. Herron and responded in writing to the Complaint. The claims were false.

65. The County had a meeting with Andy Nunemaker, CEO of EMSystem and his Counsel. Present at the meeting were Ms. Ogunsula, Mr. Herron, and Ms. Benjamin, Counsel for The County. In the meeting Mr. Nunemaker suggested that the County has been negligent in the management of the contract. He also stated again that Gwen Clerkley had promised him payment. He had previously made this claim in writing in January 2007. EMSystem threatened again to file suit against the County.

66. A few days later, in April early 2008 (before her trip to California), Ms. Ogunsula is required to attend a Prince George's County Meeting with representatives from The County's first responders and emergency preparedness personnel. Ms. Ogunsula attends the meeting as the Program Manager of the PTS program. She walked in the meeting and sat next to Mr. E. Jones, Fire Department liaison in the Prince George's County Office of Homeland Security. The meeting was held at the Public Safety Facility on Anchor Street in Landover, Maryland. Mr. Herron also joined the meeting at some point. He introduced his team including Ms. Ogunsula from Homeland Security Office. At some point early in the meeting, Mr. Jones changed his seat to the other side of the room. A few minutes later, Ms. Clerkley walked in the meeting and sat one person over from Ms. Ogunsula. During the course of the meeting, Ms. Clerkley, who now worked for the County's Transportation Department, made disparaging remarks about the PTS program during a small group exercise that both she and Ms. Ogunsula participated in. Ms. Clerkley made a remark to the effect that the project would never be successful.

67. In April 2008, a few days after the meeting between The County and EMSystem, Ms. Ogunsula made an unplanned trip to California to attend a legal hearing for a family member and to provide support to her sister who had been gravely ill.

OGUNSULA VS. ERIC HOLDER ET AL. - 21

68. Before she left, Lynn Davenport of Forestville, MD (Ms. Ogunsula's foster sister), asked her for her house keys. Ms. Ogunsula is a little puzzled by this because she is only scheduled to be gone for a week. However, she gives her keys to Ms. Davenport as they leave to go to the airport. Once Ms. Ogunsula arrives in California, Ms. Davenport tries to convince her to stay longer than she had originally plan. Ms. Davenport suggested that Ms. Ogunsula should move to California. This puzzled Ms. Ogunsula because Ms. Davenport knew that she had a job and a home in Maryland to go back to.

69. While visiting family in California, Ms. Ogunsula gets an unusual call from Mr. Bruce Clark, Pastor of Advance Church, who said that he wanted to tell her about dream he had about her. He told her that in the dream she had gone to the bank and as she was leaving the bank some men followed her demanding money. She threw some of the money at them, but Mr. Clark said that they got more threatening and demanded all of the money. He also said during the conversation that she would be offered a job and that she should not take it. Two years earlier sometime during the 2nd Quarter of 2006, Mr. Clark invited Ms. Ogunsula to lunch to tell her that 'the Lord had told him' that she was supposed to be his Minister of Music. He also told her that she should join his church. At the time Ms. Ogunsula had attended several services to provide musical accompaniment at the church where Mr. Clark pastored at his request. Ms. Ogunsula had known Mr. Clark for several years because they had attended Howard University during the same time, she told him that, at this point in time in 2006, and she did not want to make a firm and final commitment to play for any church before she had found a church where she could become a member.

70. Ms. Ogunsula attended Sunday worship services at the Greater Refuge Whittington Temple C.O.G.I.C in Oakland, California during the April 2008 visit. After the service, she went out to dinner with Jackie Orr, her sister, Valerie Whittington, a cousin, and Anika Shawnees Jefferson, a

foster sister. She told them about some of the things that were happening at her office. She also told them that she believed that the break-in in her office was not random.

71. While she is in California, she decides that she is going to resign from her position at Prince George's County Government because of the unethical practices of both Gwen Clerkley and Vernon Herron. They had both lied about the PTS project on several occasions. She also feels that they as well as other County personnel will close ranks and she would be set up to be a "fall guy". She does not feel she has an independent party to go to for help or support, like an Inspector General (County) or Ethics Officer. So, she submits a letter of resignation on April 21, 2008 giving two weeks' notice with a final day in the office of May 9, 2008. Although she does not state it in the letter, the ethical issues involving the County and EMSystem are the main reason she was resigning. She had verbally shared her concerns about the ethical issues with Mr. Herron in a meeting on February 26, 2008. She was not willing to participate in any unethical or illegal activity and she is not confident that The County's executives who are involved had the same resolve.

72. Mr. Herron asked Ms. Ogunsula to extend her stay by two weeks to May 23, 2008 to accommodate close-out project meetings with staff and regional partners. She agreed. He also requested that she take a trip to Boston, Massachusetts to evaluate the EMSystem product during a planned Mass Casualty Incident there. She declined the trip. Mr. Herron was not happy that she was leaving the project and made his feelings known during their last phone conversation. His tone of voice indicated that he was irate. Mr. E. Jones had been assigned to take over the project and Ms. Ogunsula made several attempts to meet with him before she left the position, but Mr. Jones stated that he had schedule conflicts. She prepared the project binders and documents for handoff to Mr. Jones. In 2014, Ms. Ogunsula discovered that her personnel record from Prince George's County Government reflected that she had been *terminated* when in fact Ms. Ogunsula had resigned.

OGUNSULA VS. ERIC HOLDER ET AL. - 23

73. On a day in April 2008, Ms. Ogunsula was approached by a guy coming out of the Basil Court Office Building where she worked for the Office of Homeland Security. The guy asked her if he could wash her car. He said that he knew the Office Manager in Congressman Alex Wynn's Office who also had an office in the building. She first went and spoke to the office manager in her office on the second floor. The office manager told Ms. Ogunsula that they guy had washed her car. The Officer Manager mentioned to Ms. Ogunsula that she knew Joseph Lomax who was the Deputy Manager for the Office of Homeland Security. She called him, "Lolo". Ms. Ogunsula then went back downstairs and let the guy wash her car. He wanted to take the car off the parking lot; however she refused to let him do this. When she got her car back, she noticed that the covering in the left rear wheel well had been tampered with. She questioned the guy about this and he snapped the plastic cover back into place. Several days after this incident, Ms. Ogunsula's car engine broke down. Ms. Ogunsula was suspicious of why the rear wheel weld cover had been removed since it was not necessary to bother with it to wash the car.

74. Ms. Ogunsula discovered that she has engine trouble when she returns from her California trip in April 2008 and she is on her way to a Women's Retreat some time after April 15, 2008. She later finds out that the engine is damaged and must be replaced.

75. Ms. Ogunsula's last day in the office at Prince George's County Government is May 23, 2008.

76. On Friday afternoon, June 20, 2008 when Paul and Crystal Scott arrived at Ms. Ogunsula's home with two of their children, Crystal asked her to borrow one of her evening dresses. She and Ms. Ogunsula went upstairs to the guest bedroom to look at dresses. Paul went downstairs to the basement where her laptop computer was. After the Scotts leave, she noticed that her computer had been restarted. She called Paul on his cell phone to ask what he had done to the laptop computer and why had he restarted the computer. He denied re-starting the computer. However, it is evident that the PC had been restarted.

77. Shortly after this computer incident, she starts to notice problems with the PC where emails are sent multiple times or before she is finished typing them. There are several occasions where this takes place. Also other software does not work properly. At different times, it feels like someone had remote control of the computer.

78. Receive notice via U.S. mail that my mortgage has been transferred from First Horizon Mortgage of Dallas, TX (a subsidiary of a bank in Tennessee) to Everhome Mortgage of Jacksonville, Florida

79. Between June and December 2008, Ms. Ogunsula noticed that her porch light is broken several times when she arrived home after dark.

80. On October 3, 2008, Ms. Ogunsula made the acquaintance of both then County Executive Jack Johnson and State's Attorney Glen Ivey at First Baptist Church of Glenarden in Upper Marlboro, Maryland during a birthday celebration for the Pastor, John K. Jenkins. Prior to this meeting she had not formally met either of them.

81. In October 2008, Ms. Ogunsula visited the Greenbelt Police Department to follow-up on a 2001 sexual assault and to inquire whether a suspect had ever been identified. She was concerned about the repeated broken porch light and an earlier incident where four men in a green car had been in the neighborhood asking questions about her.

82. In November 2008, at Thanksgiving dinner: Ms. Ogunsula felt unsafe during an incidence after dinner at the home of Barbara Pennington in SE Washington, DC. This occurred after the Thanksgiving Meal. The attendees that were there after the meal were:

- Lynn Davenport (daughter of Naomi Whittington) of Forestville, MD;
- Bettie Thompson of SE Washington, DC (sister-in-law of Naomi Whittington); Bettie is a member of the Christian Science Church in D.C.
- Robert and Shirley Jones of Temple Hills, MD (long-time friends of Lynn Davenport); Robert Jones is a former firefighter.

OGUNSULA VS. ERIC HOLDER ET AL. - 25

- Joseph A. (III) and Valencia Thompson, his wife, of Temple Hills (cousin of Lynn Davenport and nephew of Betty Thompson by marriage);

- Joseph A Thompson IV and his two daughters;

- Ian Thompson, youngest son of Joseph A. and Valencia.

The incident: All of the men had gone downstairs to the basement of the house and called Ms. Ogunsula to come down there. At that moment, she was in the kitchen, which is adjacent to the stairway to the basement, by herself. The elder Joseph kept trying to entice her into the basement, but she would not go. For some reason, at that very moment, Ms. Ogunsula felt very unsafe. She had never felt that way before around them. On the following Saturday night, she drove to the Greenbelt Police Department because she had come to believe that: 1) the 2001 sexual assault was not a "crime of chance" or random.

83. In December 2008, Ms. Ogunsula noticed that personal identification documents were missing from her home. The documents included a birth certificate, social security card, Howard University degree, and Howard University grades and payment receipts. The documents were kept upstairs in her office.

84. Ms. Ogunsula encountered great difficulty in making a formal report of the stolen documents from her home. In addition to the three attempts to file a written report regarding the personal identification documents (i.e., birth certificate, social security card, undergraduate degree and college transcripts and payment receipts) she had to write a letter to the Chief of Police, Mr. Roberto Hylton, in order to request that a formal report be made. On her third attempt to file a report, she was told unequivocally by the officer that he would give her a report number but he would not file a written report. Officer Consoli, a police officer who called her after she had written to Chief Hylton, facilitated the filing of the written report. Still there was an error in the police report--it incorrectly listed the items as "lost" although the letter to the Police Chief stated that the items were "stolen".

85. In February 2009, while visiting Bowie State University, Ms. Ogunsula passed by a group of young women who said loud enough for her to hear that "you can't fight all of the people who are watching you!" By this time Ms. Ogunsula already had a sense on several occasions that she was being followed in her car when she drove around the metropolitan area. It wasn't like it was the same car, but it was just a sense she had of being followed. Several times when leaving the community development in her car, she was almost hit on the main street, Vista Gardens Drive. It seemed intentional and she complained to the Chuck Van Den Bossche, a resident and member of the Vista Garden Home Owners Association Board, who then lived on Morning Glory Way. He just made a comment about aggressive driving in the community.

86. Also in February 2009, Ms. Ogunsula began to do law research and work on a False Claims Act Complaint at University of Maryland Law School in Baltimore, Maryland because she believed that, among other unethical things that had taken place while she was employed by Prince George's County Government, she was pressured to pay EMSystem for a deficient product and she was also retaliated against for being truthful during internal investigations.

87. On Tuesday, March 24, she visited the Maryland Bar Association building to obtain information from the Maryland State Bar Association (MSBA) in Baltimore, Maryland because of a referral by a professor at the University of Maryland, School of Law. The Security Guard questioned her on the reason for her visit and Ms. Ogunsula stated that she wanted to obtain a list of law firms/attorneys specializing in civil rights. She was then provided with the number for the Attorney Complaint Line which was not the information she had requested. A lady who said she was a legal assistant from MSBA office came into the reception area. However, she was unwilling to provide Ms. Ogunsula with a business card for the Executive Director or contact information or any collateral. Ms. Ogunsula went back to her car and called Professor Douglas Colbert, the professor who had originally referred her to the MSBA. She told him she was having a difficult time getting the information. He told her to try again.

88. She got out of the car and entered the building again to request information. While she was standing in the lobby, one of the two officers from the University of Maryland at Baltimore Police Department she had previously observed entering the building while she was sitting in her car making the phone call to Professor Colbert, approached her in the lobby and accused her of roaming through the building. This was a lie. Before the incident had ended, a total of four officers from the University of Maryland at Baltimore Police Department had come to the scene. At no time was Ms. Ogunsula belligerent or disorderly.

89. She perceived this as some type of police intimidation and it was very shocking to her because she was just trying to obtain an attorney referral. She was asked by an officer on the scene for her identification and she gave him her driver's license. They said that they wanted to run a background check on her. The situation began to escalate because another officer, Officer Baker, began raising his voice and making allegations that she had been trespassing. All of these allegations were refuted offering a factual account of her previous visit to the building that could be verified by a check of the log book and individuals with whom she had met with. Officer Baker was unwilling to check the log book. Officer Baker gave her an option of having her picture taken or being arrested. She refused to have her picture taken and asked if she could call an attorney. She called Mr. James McCollum but he could not speak to her at that moment because he was in a meeting. She gave his secretary a message for him. Officer Baker then relented on this request and she was released and told that she cannot come back into the building unless she had an appointment.

90. Following the incident, Ms. Ogunsula emailed the Executive Director of the MSBA and gave him an account of the incident. He apologized to her for the difficulty and said that their office did not offer direct referrals to attorneys.

91. Sometime between March and May 2009, Ms. Ogunsula first visited the FBI Field Office in Baltimore to talk about the problems she had encountered at Prince George's County Government.

She also believed that some of the events that had transpired since leaving employment there and her inability to obtain other employment was connected to Prince George's County, MD. On a day within this time period, she spoke to Duty Agent, Michael Fregeau at the FBI Office in Baltimore. After talking with him, he advised her to submit a complaint in order get an investigation started.

92. In April 2009, Ms. Ogunsula visited the Social Security Office on 21st and M Street NW in Washington, D.C. and to get a replacement Social Security Card. The clerk, an older African American woman, told her that her citizenship status is "resident alien". She is shocked by her comment. She had never even heard of a citizenship status called "Resident Alien" and she was baffled as to why her citizenship status would be such. Immediately, she is concerned that, with the documents that have been stolen from her home and several past experiences, there has been some type of fraud. A replacement Social Security card, that was applied for in the Social Security Administration's (SSA) Washington, D.C. Field Office on or about April 8, 2009 and was mailed according to SSA staff on or about April 15, 2009, was never received. At this point, she is really concerned about Identity Theft and/or some type of fraud. She had also experienced problems with her U.S. mail not being delivered. Coupled with the theft of her ID and purse contents in California, she is very concerned that she could be the victim of foul play.

93. In April 2009, Ms. Ogunsula mailed her federal and state tax return via U.S. Mail to an IRS address in Pennsylvania and a Maryland Revenue Administration address in Annapolis, Maryland, respectively. However, she discovered a few months later by calling the Maryland Revenue Agency to check on her refund that the Maryland Revenue Administration office had never received her state tax return. She drove to Annapolis and hand delivered a copy of the tax return. Sometime after this visit to deliver in person the State Tax Return, she was told that they had found the original return.

94. On April 15, 2009, Ms. Ogunsula discovered that her laptop computer's hard drive has been damaged. The hard drive of the Gateway Laptop is physically damaged. When the files are restored, the files tampered with or deleted are the files regarding the Homeland Security Grant or False Claims Act (FCA) Complaint. The computer had to be replaced. She went to Computertech 10979 Baltimore Ave, Beltsville, MD 20705, Phone: (301) 572-8088 of Laurel, MD to have them check out the old laptop computer. They confirm the computer hard drive is damaged. She requested that they encase the hard drive. When she checks the hard drive, she also discovered that certain files from a game on her computer called "THE SIMS" had been deleted. Specifically, a character she had on the game called "Nona" had been *deleted* from the "neighborhood". Nona is Ms. Ogunsula's middle or nickname. No other files within the game are missing. This appears to be a deliberate act.

95. On June 19, 2009, she submitted a False Claims Act Complaint addressed to Rod Rosenstein in person to the U.S. Attorney's in Baltimore. Melanie Glickson in the U.S. Attorney's Office came to the lobby to receive the complaint. One June 24, 2009, she delivered a copy of the False Claims Act Complaint to the FBI Field Office in Baltimore addressed to Amy Jo Lyons, who was then the Special Agent-In Charge. An agent or the "Agent on Duty" came out and took her complaint. He did not give her his name or his badge number.

96. In June 2009, Ms. Ogunsula contacted Ms. Gwen Boyd at John Hopkins to ask for her assistance in contacting Jacqueline Brown, then Chief Administrative Officer at Prince George's County Government, about the incidences of stalking, hard drives being damaged, and other troubling events. Ms. Ogunsula believed this to be some form of retaliation connected to her wok at Prince George's County Government. She contacted Ms. Boyd because both she and Ms. Boyd were members of Delta Sigma Theta, Sorority, Inc. and Ms. Ogunsula had known Gwen since 1987 when Ms. Boyd was her Chapter Advisor. Ms. Ogunsula was hoping to gain advice from Ms. Boyd on how to succeed and to get her possible to contact Ms. Brown on her behalf to determine

why Ms. Ogunsula was being retaliated against. Ms. Boyd talked to her briefly, said that she was about to go on travel out of the country, and promised to call her back but Ms. Ogunsula never heard from her again.

97. Ms. Ogunsula called the FBI Baltimore Field office in August 2009 and was told that the complaint would be referred to the Field Office and someone would contact her within three weeks. When no one from the Field Office called during the three week period, Ms. Ogunsula called again to follow-up in September 2009 and was spoken to rudely by the Duty Agent.

98. After the September 2009 incident where she was spoken to rudely by the FBI Duty Agent at the Baltimore Field Office, Ms. Ogunsula contacted Mr. Wiltz, a Special Agent who worked in the FBI Headquarters location in Washington, DC. Ms. Ogunsula knew him from her employment with Kettering Baptist Church. He is a member of Kettering Baptist. She communicated to him that she is concerned that the FBI in Baltimore has been unresponsive to her request. He said that he would deliver the letter to them. On or about October 15, 2009, she hand delivered a copy of a letter and copy of the False Claims Act Complaint (June 2009) to him in the parking lot of Safeway Food Store on Central Avenue in Kettering, Maryland. Mr. Wiltz promised to make sure the Baltimore FBI Field Office received the letter.

99. Between September and October of 2009, certified correspondence mailed to her from the mortgage company, Everhome Mortgage of Jacksonville, Florida is not received. Per Everhome Mortgage, at least two of the letters are marked "undeliverable after three attempts" and were returned to the company. Ms. Ogunsula never received these letters or any notices.

100.    While in Philadelphia, PA on trip to explore employment opportunities on December 4, 2009, Ms. Ogunsula visited the FBI Office there looking for assistance. She still had not received any type of acknowledgement from the FBI Field Office in Baltimore and she was getting worried. She spoke with a Duty Agent about the activities that had taken place during and after her employment with Prince George's County Government. She provided specific information

regarding being pressured to pay a vendor in full for questionable products/services, retaliation for not complying with the directive to pay a vendor for defective services, and stalking and harassment by law enforcement and other individuals. She also told the representative of a specific incident that had taken place in June 2006 with her being the recipient of a "Tuberculosis shot/test". She told the representative that she believed the "shot/test" had had an adverse effect on her physical health. She was told by the representative at the FBI Offices in Philadelphia she met with that they did not have any jurisdiction over the FBI Field Office in Baltimore, Maryland. He also told her that she needed to forget about events that had taken place during her employment with Prince George's County Government.

101.    On December 31, 2009 Ms. Ogunsula sent certified correspondence to Attorney General Eric Holder regarding the events that took place during and after working for Prince George's County Government. She requested his assistance in getting an investigation of the previously mentioned events. Also she mentioned being stalked and harassed by law enforcement within the State of Maryland; mail being tampered with, property been vandalized, as well as her physical well-being being threatened. She never received a response to the letter.

102.    It was Ms. Ogunsula's desire to move on with her life, but she has been unable to do so because she had not been able to find employment and she seemed to be the target of deliberate foul play and retaliation.

103.    In January 2010, Ms. Ogunsula received a letter in response to her complaint to the FBI's Baltimore Field Office that there was no evidence of Civil Rights violations.

104.    Ms. Ogunsula met with then State's Attorney for Prince George's County Maryland, Glen F. Ivey in January 2010.

105.    In March 2010, Ms. Ogunsula sent certified correspondence to Thomas Perez, Assistant Attorney General, Civil Rights Division at the Department of Justice.

106.    Continuing to seek relief and assistance, Ms. Ogunsula sent correspondence to:

    a.   H. Marshall Jarrett, Director, Executive Office of the U.S. Attorneys, DOJ, Washington, DC

    b.   Patrick Bohrer, Special Agent, Assistant Section Chief, Public Corruption, FBI Headquarters

    c.   Lanny A. Breuer, Assistant Attorney General, Criminal Division, DOJ, Washington, DC

107.    Noting irregularities with the foreclosure of her personal residence in Bowie, Maryland, and other extenuating circumstances for which she was petitioning federal law enforcement, Ms. Ogunsula contacts Mr. Terry Edwards, Executive Vice President, Credit Portfolio Management, at Fannie Mae for intervention and consideration.

108.    In January 2011, Ms. Ogunsula drives to the FBI Field Office in Baltimore, Maryland to again try to gain their assistance with the aforementioned issues and the irregularities she had experienced with the foreclosure of her home, the thefts that had occurred and other retaliation she was experiencing.

109.    Over the next few months in 2011, Ms. Ogunsula is contacted by the FBI, Agent Coyle, and they attempt to meet several times. They finally meet in Baltimore and Ms. Ogunsula brings documents and photos, however Mr. Coyle says that he cannot accept any information; he states that he has to subpoena any documents related to a case of corruption in Prince George's County Government. He promises to follow up, but does not.

110.    Ms. Ogunsula sent certified correspondence to the Inspector General for the Department of Justice, Michael E. Horrowitz, regarding interactions with FBI in July 2012. In August 2012, she received correspondence from Sandra Bongo, Unit Chief, Initial Processing Unit, Internal Investigations Section, Inspections Division at the FBI headquarters that they would take no further action.

111.    Ms. Ogunsula hand delivered correspondence addressed to Senator Tom Carper,

Chairman, Homeland Security and Governmental Affairs Committee in October 2013 requesting

assistance.

112.    Ms. Ogunsula sent correspondence to Senator Barbara Mikulski requesting assistance.

113.    In May 2014, Ms. Ogunsula faxed correspondence to the Prince George's State's

Attorney, Angela Alsobrooks, regarding an incident where I was followed by two Hispanic males.

This was not the first time I had been followed in Prince George's County, MD or the

Washington, D.C. metropolitan area. These kinds of "stalking or mobbing" incidents began in

2009 around the time I began working on the original FBI complaint.

114.    In July 2014 through January 2015, Ms. Ogunsula, sent correspondence to the Judiciary

Committee members of the Senate requesting their oversight and assistance regarding the way

this case was handled by the FBI and Department of Justice.

115.    In July 2014, Ms. Ogunsula has been unemployed for over 72 months (6 years). During

that time she has contacted over 25 -30 staffing and temporary staffing firms. In order to

document the blacklisting, she contacts over 12 temporary staffing agencies to sign up for work

assignments. Two of the firms refuse to give her an opportunity to interview:       4Staff of

Washington, D.C. and All U Need Personnel of Washington, D.C. Although she scores above

average to Excellent on the Office Automation Tests for five of the firms, none of them send her

out on any assignment. The firms are:     Contemporary Staffing of Silver Spring, Staffing Now of

Washington, D.C., Hire Standard of Bethesda, MD, Kelly's Services of Washington, D.C., and

Telesec Corestaff of Washington, D.C.  In December 2014 she contacted the EEOC to begin

complaints against at least two of the companies. She continues to apply for other full-time

professional positions more aligned with her education and experience.

116.    Ms. Ogunsula discovers evidence that suggest a conspiracy to cause her physical harm in

March 2015.

117.     Ms. Ogunsula is evicted from her home on April 9, 2015.


CAUSES OF ACTION

COUNT I

Conspiracy regarding First, Fourth, Eighth, Thirteenth, and Fourteenth Amendments; Failure To

Intercede

Federal Law Enforcement

118.     Paragraphs 1- 114 are incorporated by reference as though fully set forth.

119.     The Inspector General, FBI personnel and the U.S. Attorney's Office headquarters and

Baltimore, Maryland failed in their oaths of office to protect and defend the Constitution of the

United States with regard to Ms. Ogunsula rights. In fact, they—Mr. Thomas Perez, Mr. H.

Marshall Jarrett and Mr. Joseph Campbell, failed to intercede to prevent an abuse of certain

protections guaranteed to her by the First, Fourth, Fifth, Sixth, Eighth, Thirteenth, and Fourteenth

Amendments of the United States Constitution.

120.     Ms. Ogunsula submitted her first complaint to the FBI and the U.S. Attorney's Office,

both in Baltimore, Maryland, in June 2009 that provided details of the program procurement,

program's test results, the burglary at the Largo Office, information regarding being stalked, and

the thefts of Ms. Ogunsula's personal and work-related information, etc. she also provided

information regarding acts of police intimidation, mobbing, and a rodent being found in her home.

121.     In January 2010, she received a written a response from the FBI's Baltimore Field Office

that her case did not provide any evidence of Civil Rights violations. They did not address the

other issues.

122.     By this time, it had been over 18 months since she had been employed or received any

income from employment. She was concerned that she had been targeted because of the troubling

events that had taken place (e.g., guys in green car asking questions about her, stalking, porch light repeatedly broken, comment at Bowie State University, etc.).

123.     In March 2010, Ms. Ogunsula sought further assistance from federal authorities by sending correspondence to the following:

- Thomas Perez, Assistant Attorney General, Civil Rights Division, Department of Justice
- H. Marshall Jarrett, Director, Executive Office of the U.S. Attorneys, DOJ, Washington, DC
- Patrick Bohrer, Special Agent, Assistant Section Chief, Public Corruption, FBI Headquarters
- Lanny A. Breuer, Assistant Attorney General, Criminal Division, DOJ, Washington, DC

Federal authorities showed little to no interest investigating the facts in the request. Mr. Perez, Mr. Jarrett and Mr. Kevin Perkins, on behalf of the Criminal Division, responded in writing to the request for assistance. Without even an investigation or interview of Ms. Ogunsula, they responded that there was no or insufficient evidence to authorize an investigation. However, federal authorities had been provided enough information to warrant a 42 U.S.C. §1983 or 1985 or corruption and retaliation investigation based on the following:

- A burglary that occurred at a Prince George's County Government office location of computers which contained the program details, including vendor payment, details of a failing program/controversial project that had been through two internal investigations.
- Documentation that a public official having supervisory responsibility for the program had been untruthful about the details of the program. Further, the aforementioned burglary of computers had occurred in an office location under this public official's supervisory responsibility.

OGUNSULA VS. ERIC HOLDER ET AL. - 36

- Information that Ms. Ogunsula had been followed and stalked;

- Information on Ms. Ogunsula's laptop hard drive had been damaged on different two occasions. The second incident which occurred in April/May 2009, after she left employment with Prince George's County Government, is when she discovered that files pertaining related to the False Claims FBI Complaint as well as the PTS project had been deleted.

- Ms. Ogunsula also included information in the FBI complaint about a disturbing incident where she found a dead rodent and rat poison in her home in June 2009. This occurred after she began working on the FBI complaint, her negative encounters with police in Baltimore at the MSBA building in April 2009.

Ms. Ogunsula included information (e.g., hard drive damage, three thefts, strange young men in her neighborhood asking questions about her, stalking, police intimidation, etc.) in the complaint and correspondence that should have at least warranted some type of investigation or thorough review. Ms. Ogunsula is not a detective nor should she have been expected to know every detail regarding the motive for why these things were happening, and who was responsible for the unexplained events that was happening. That is the role of law enforcement and they failed to uphold the mission and oath of their office.


COUNT II

Conspiracy regarding First, Fourth, Eighth, Thirteenth, and Fourteenth Amendments;

Failure To Intercede

Federal Law Enforcement

124.     Paragraphs 1- 123 are incorporated by reference as though fully set forth.

125.     Beginning in 2012-2014, Ms. Ogunsula contacted DOJ's Inspector General's Office and the U.S. Attorney's Office of the District of Columbia and the FBI Field Office in Washington,

D.C. She received correspondence from and communicated with Sandra Bungo and Sharon Marcus-Kurn.

126.    In July 2012, the plaintiff wrote a letter to Michael E. Horowitz, Inspector General of the Department of Justice, to request an investigation of the FBI's Field Office in Baltimore, Maryland, U.S. Attorney's Office in Baltimore, and the Executive Office for U.S. Attorneys' handling of information the plaintiff had provided to them via U.S. mail requesting an investigation of activities that the plaintiff believed to be corrupt and fraudulent in nature that took place while she was employed by Prince George's County Maryland Government. The plaintiff also provided Mr. Horowitz with additional and new information which she had not previously disclosed regarding activities she believed to be criminal civil rights violations and a conspiracy against rights violation under the color of law, peonage and included a cover-up of said activities. Perpetrators of the criminal activities included both private individuals and government employees, including law enforcement.  Placing faith in the American justice system and the integrity of Mr. Horowitz's position as Inspector General, the plaintiff requested his intervention and a thorough investigation of the activities included in her letter to him or referral to the appropriate federal authorities for investigation. Those activities were of a serious nature and included victim intimidation, retaliation, egregious civil rights violations, a conspiracy against rights, and racketeering.

127.    In the Horowitz letter, Ms. Ogunsula wrote to Mr. Horowitz because the conspiracy was ongoing and she felt that she was in both physical and financial jeopardy. By this time Ms. Ogunsula had been out of work for more than 48 months.

128.    Ms. Ogunsula provided specific information against her former employer, federal law enforcement she had interacted with, organizations both private and public who were complicit in the conspiracy to deprive Ms. Ogunsula of her Constitutional Rights, namely:

a. First Amendment—Freedom to speak truthfully about federal program results to leadership and employees during an investigation without retaliation

b. Fourth Amendment—Police intimidation

c. Fifth Amendment— Due process with regard to foreclosure of her personal resident; conspiracy to accuse Ms. Ogunsula of criminal child abuse

d. Seventh Amendment—Right to sue; blacklisting

e. Eighth Amendment—Cruel and unusual punishment; detention; not being able to work for income for food and shelter

f. Thirteenth Amendment—Peonage

g. Fourteenth Amendments—Equal protection of rights under law;

129. Instead of intervening, Federal law enforcement became complicit in a cover-up of allegations previously set forth.

130. Ms. Ogunsula provided detailed information in the letter, attachments, and USB drive to support the following her statements:

a. FBI personnel in the Baltimore Field Office had not responded appropriately or had been unresponsive regarding Ms. Ogunsula's complaints of "retaliation, civil rights violations, a conspiracy against rights, racketeering and corruption by Prince George's County Government officials, members of law enforcement and private individuals. There was a deprivation of rights under law by employees of Prince George's County in the Court Division. There were also similar instances of deprivation of rights with regard to Everhome Mortgage Company, Friedman and MacFayden Law Firm of Baltimore, MD, Vista Garden Home Owners Association of Bowie, MD, Zalco Management of Silver Spring, MD. She believes that these incidences were retaliatory in nature for her having submitted a complaint to the FBI on corruption at Prince George's County Government.

  i. Three thefts that were related to the on-going conspiracy to harm Ms. Ogunsula: March 2006 in Oakland, California (personal property, cell phone, palm pilot, etc.); September 2007 at Prince George's County Maryland Government office in Largo, Maryland (government property-computers)

  ii. February 2009— Bowie, Maryland (personal identification documents, college transcripts, college grade reports);

b. In June 2009, days before she submitted a formal complaint to the FBI and US Attorney's office, Ms. Ogunsula found a rat/rodent and rat poison in her home.

c. Details about a June 2006 "test" had been administered by Prince George's County Health Department to Ms. Ogunsula that had had an adverse effect on her health.

d. Irregularities in the foreclosure of Ms. Ogunsula's personal residence by Everhome Mortgage Company and Friedman and MacFayden Law Firm of Baltimore, MD (Friedman and MacFayden were sued for major foreclosure fraud—Goodman vs. Friedman and MacFayden)

e. Irregularities, overbilling, and exorbitant Attorney Fees by Vista Gardens Home Owner's Association Attorney's, Nagle and Zaller (they were sued for their debt collection practices; Elissha Castillo vs. Nagle & Zaller P.C.)

f. Mr. Bryan Foreman from the U.S. Attorney's Office in Greenbelt, MD blamed Ms. Ogunsula for the troubling incidences that had occurred while she worked for Prince George's County. When she discussed the issues regarding being labeled as gay in the workplace and the inappropriate behavior with Mr. Joseph Lomax (former State Trooper), Mr. Foreman suggested that Ms. Ogunsula was mentally ill because she took a moment to regain her composure. He summarily dismissed all her concerns and complaints about being discriminated against both in her workplace and at church because it was rumored that she was gay.

OGUNSULA VS. ERIC HOLDER ET AL. - 40

g.   Because of all of the identification documents that had been stolen, Ms. Ogunsula expressed concern that she had been targeted for identity theft. She also documented that her mail had been stolen. Further, she was told by a clerk in the Washington D.C. Social Security Field Office that her Social Security record had been changed from "citizen" to "resident alien".

h.   In May 2012, Ms. Ogunsula's website hosting provider informed her that they had intercepted emails that she had not sent. These emails had come from her account.

i.   As previously set forth, after being told by Lisa Owens that "she had done something to the people in New Jersey", Ms. Ogunsula began to notice strange cars parked adjacent to her home. Two of the cars had a connection to New Jersey and specifically to police organizations there. One of the cars appeared at 4623 Morning Glory Trail. The owner of the home is also from Nutley, New Jersey and Essex County. Lisa Lewis Owens' family lives in Montclair, New Jersey which is also in Essex County. There is an additional foreclosure, 10844 Vista Gardens Drive that was purchased in her neighborhood where the owner or the resident drove a vehicle with New Jersey tags (SSN 40K).

j.   Ms. Ogunsula's 2009 Maryland State Tax Return, mailed from a Prince George's County Post Office, was reported to be missing. Secondly, in August 2009 she did not receive her regular banks statements from Bank of America.

k.   Being followed and watched by young men in a green four-door car who had asked her neighbor, T. Mead, questions about her. She did not know these young men and she was concerned about why they would be watching or asking questions about her. At this time, no suspect had been identified in the 2001 sexual assault.

131.   Although Ms. Ogunsula, provided detailed evidence of being targeted, a conspiracy to deprive her of her rights, information regarding being stalked, incidences of police intimidation,

and incidences of witness intimidation, federal law enforcement did not intercede in order to protect Ms. Ogunsula's rights.

132.    In fact, Ms. Bungo's summarily dismissed Ms. Ogunsula's claims, took no notice of Ms. Ogunsula new claims and allegations regarding racketeering (peonage), and did not refer the letter and additional information to the Baltimore Field Office for review or follow-up.  Ms. Ogunsula made specific claims of being victimized because she had disclosed information to federal law enforcement regarding work-related projects. She also provided information in the letter of an on-going conspiracy based on those claims. Ms. Ogunsula's further asserts that Ms. Bungo's actions reinforced a "blue wall" at both the federal and local level of law enforcement. These types of actions are harmful to and discourage witnesses who come forward to provide information of criminal behavior and wrong-doing. All of the above information was provided to the Office of the Inspector General of the Department of Justice including the following these troubling fact:  Ms. Ogunsula found a rat and poison in her home after she started working on the federal complaint to the FBI.

133.    Federal law enforcement, namely Thomas Coyle, made promises and did not follow up.

134.    Further, federal law enforcement namely Thomas Perez, Joseph S. Campbell, Stephen Vogt, Sharon Marcus-Kurn, and Ms. Bungo's actions seem to dismiss or cover-up the incidences that had been reported rather than recommending an investigation of the factual allegations that had been fully set forth in this complaint and prior correspondence to the Office of the Inspector General.

135.    Ms. Ogunsula asserts that she was and is a witness as defined under 18 U.S.C. § 1512 and 1513 in several regards:

a.  Ms. Ogunsula provided to federal law enforcement information regarding corrupt practices that took place during her employment with Prince George's County Maryland Government

b.  Ms. Ogunsula provided testimony regarding a 2001 sexual assault where she was the victim and in the fall 2008 sought the assistance of local enforcement because of the thefts, stalking, and other threatening behavior that had taken place. Ms. Ogunsula felt threatened by the stalking, intimidation and retaliation and she made that known to both federal law enforcement at the Baltimore Field Office and the Inspector General's Office.

136.     Ms. Ogunsula alleges the actions reflected a deliberate indifference with regard to violations of her First, Fourth, Fifth, Seventh, Eighth, Thirteenth, and Fourteenth Amendment rights, privileges, or immunities secured by the Constitution and laws.

137.     Ms. Ogunsula endured an extralegal campaign where she was subjected to cruel and unusual punishment. A coordinated campaign took place to prevent Ms. Ogunsula from earning a living. As will be plead in later paragraphs and a separate RICO complaint, Ms. Ogunsula was both retaliated and discriminated against in employment applications since she made complaints about the criminal activity at Prince George's County Government and visited the Greenbelt Police Station to inquire about the 2001 rape case.

## COUNT III

Fourth and Fourteenth Amendment Violations

FAILURE TO INTERCEDE

138.     Paragraphs 1-137 are incorporated by reference as though fully set forth.

139.     As a witness who provided information to both federal and local law enforcement, federal law enforcement named in this complaint failed to intercede and each had opportunities to intercede on behalf of Ms. Ogunsula's behalf to prevent both 42 U.S.C. Section 1983, 1985, and 18 Section 1962--1512 and 1513 claims. Their actions resulted in loss of Ms. Ogunsula's livelihood, unreasonable seizure but due to their intentional conduct or deliberate indifference declined or refusal to intercede.

OGUNSULA VS. ERIC HOLDER ET AL. - 43

140.     Further their conduct allowed or acquiesced to an on-going conspiracy to cause Ms.
Ogunsula emotional distress from unlawful surveillance, stalking, cruel and unusual
abuse/punishment, physical assault, lack of food, and shelter.

141.     As recently as December 2014, Ms. Ogunsula contacted Ms. Sharon Marcus-Kurn in the
-U.S. Attorney in Washington, D.C. to provide of evidence of the on-going conspiracy including
civil rights violations related to religious and employment discrimination, discrimination because
of perceived sexual orientation, witness intimidation, extortion, and a conspiracy against rights by
both religious organizations and local law enforcement. Ms. Ogunsula emailed a letter that had
originally been addressed to the FBI Special-Agent-In-Charge in Washington, D.C. Ms. Kurn
never responded to Ms. Ogunsula's email or voice mail requests for follow-up on the information
received. When Ms. Ogunsula finally reached Ms. Kurn in person via phone in February 2015,
Ms. Kurn stated that there was no human trafficking evidence in the information received and
rushed off the phone. Ms. Ogunsula sent a follow-up email to Ms. Kurn inquiring if she could
provide a response regarding any other civil rights violations contained in the email. Ms. Kurn's
never responded to the email.

142.     In September 2013, Ms. Ogunsula tried to deliver the original letter to the FBI Agent who
had identified himself as Agent #1999. He had original had requested the correspondence during
an August 2013 visit; FBI police refused to accept the letter and responded that there was no
Agent #1999. Ms. Ogunsula called the DC Field Office's main number and was not directed to
Agent #1999. The aforementioned letter was originally addressed to Valerie Parlave, Assistant
Director In Charge, FBI Washington Field Office.


COUNT IV

42 U.S.C. § 1983 Conspiracy –Prince George's County Maryland;

143.     Paragraphs 1- 142 are incorporated by reference as though fully set forth.

144.     Defendants Gwendolyn Clerkley, as the Acting Health Officer; the late David Leibowitz, as the Deputy County Attorney; and Vernon Herron, as the Chief Administrator Officer for Public Safety and Director of Homeland Security, all public officials of Prince George's County Maryland Government, engaged in a conspiracy to lie about the details of a procurement involving EMSystem and Salamander Technology and the project details.

145.     In a meeting with Gwen Clerkley (via telephone) and the late David Leibowitz (in person) on or about April 24, 2007, when discussing the details of the Emergency RFP and the details of the EMSystem contract and PTS program, Ms. Ogunsula, the PTS program manager, was told by Mr. Leibowitz that her recollection of the facts concerning the program activities needed to coincide with Ms. Clerkley's recollection when she tried to truthfully answer his questions about the PTS program and procurement. Mr. Liebowitz told Ms. Ogunsula that 'we need to protect Gwen'. Also Mr. Leibowitz indicated his displeasure with Ms. Ogunsula's truthful answers by raising his voice. Ms. Ogunsula perceived this as intimidation.

146.     Vernon Herron, less than a month or so later, lied to State of Maryland and National Capital Region senior executives about the details of a federal grant funding request in a meeting that occurred in May or June 2007. Mr. Herron then engaged in a series of activities to conceal his untruthfulness. The statements that Mr. Herron made did not constitute a crime, however the actions that followed the statements do rise to the level of criminal behavior and those actions began a conspiracy that did great harm to Ms. Ogunsula. Those actions/behavior were in furtherance of a conspiracy to conceal details regarding a federal government funded project, alienate Ms. Ogunsula from the project team and vendors, and force her to resign.

147.     Mr. Herron then told Ms. Ogunsula not to attend project team meetings. She was not invited to The County's Office of Homeland Security meetings and her salary was delayed for over 30 days in June/July 2007, which was 2 months after his meeting with Maryland and NCR senior executives.

148.     In September 2007, a burglary of six computers, including three of the federal government funded program computers containing confidential PTS program information regarding the software test results and billing details, occurred at the Office of Homeland Security location in Largo, Maryland. Mr. Herron stated publicly in a staff meeting the day after the burglary that he used his influence to keep the burglary out of the press.

149.     On information and belief, Mr. Herron involved other Prince George's employees in the conspiracy when, a few days after the September 2007 burglary and staff meeting, Ms. Weatherly asked Ms. Ogunsula for the aforementioned USB (where she had backup data for the federal program) to deliver r a letter to Mr. Herron. Ms. Ogunsula had previously told Mr. Herron in a one-on-one conversation after the staff meeting about the burglary that she had a USB drive with a backup of the program data that was on one the stolen laptop PCs.

150.     In furtherance of the conspiracy, when asked by Ms. Ogunsula about his statement to the Maryland and NCR executives, after she had received an email from a Maryland Emergency Management Agency (MEMA) employee in November 2007, Mr. Herron's remarked to Ms. Ogunsula during the phone conversation "we got caught".

151.     Although he had made a unilateral decision to misrepresent the project funding request information, when the lie was formally exposed in the email from the MEMA employee, Mr. Herron continued to involve Ms. Ogunsula by asking her to send an email to the MEMA employee and come up with an explanation for what had happened.

152.     In April 2008, in a Prince George's County meeting of first responders and emergency preparedness personnel, Ms. Clerkley publicly made disparaging comments about the PTS project during a small group exercise that included Ms. Ogunsula. She further implied that the project would not be successful and that no one would ever use the PTS software. Ms. Ogunsula did not respond.

OGUNSULA VS. ERIC HOLDER ET AL. - 46

153.    Although Ms. Ogunsula resigned of her own accord by letter to Mr. Vernon Herron on

April 21, 2008 and at his request extended her stay to May 23, 2008 from the original date of

May 9, 2008, because of the unethical practices and actions of both of her Prince George's

County managers, she discovered in 2014 that her personnel documents had been coded to

indicate that she had been terminated. This was not true. In fact, Ms. Ogunsula's 4/21/08

resignation letter was her 2nd letter of resignation. Her first letter was delivered in-person to Mr.

Herron on February 26, 2008. Defendants, Prince George's County Government, engaged in a

course of action with said personnel documents to cover-up Ms. Ogunsula's reason for

voluntarily resigning from the position she held; the documents provide evidence of a conspiracy

to actually harm her in her job/employment search and cause her financial harm. Ms. Ogunsula

does hold that she was "*constructively*" terminated because she would not conceal the results of

the vendor's performance; would not be untruthful about the terms and condition of the vendor's

contract; would not pay the vendor's bills without first validating the charges; would not validate

or sign off on payment requests that included overpayments to the vendor and would not lie to

government officials about the details of funding requests.


COUNT V

42 U.S.C. § 1983 Conspiracy and Deprivation of Rights

Prince George's County Maryland;

154.    Paragraphs 1- 153 are incorporated by reference as though fully set forth.

155.    In June 2006, while acting in the capacity of the Health Officer, Ms. Clerkley called and

directed Ms. Ogunsula to go the Environmental Health Department of PGHD and get a

"Tuberculosis" test. She was not given an option to see her own doctor as was the policy of the

State of Maryland for this procedure. Ms. Ogunsula was not even sure why she was going to

Environmental Health. When Ms. Ogunsula arrived in the Environmental Health Department, she

OGUNSULA VS. ERIC HOLDER ET AL. - 47

was greeted by Montora Mayes. Ms. Ogunsula recognized Ms. Mayes as a member of Kettering Baptist Church of Largo, MD. As previously mentioned, Ms. Clerkley as well as Mr. Floyd Wiltz, FBI Supervisory Agent, also attends this church. Ms. Mayes administered a "TB" shot. The plaintiff was not given an opportunity to have her personal physician administer this procedure. The "the shot" had an adverse effect on her health. In fact, "the shot" caused her to go into early menopause.

156.     Ms. Ogunsula did not become aware of the effects of "the shot" until after she left employment with Prince George's County.

157.     Ms. Ogunsula formally reported in writing this in the July 2012 letter to Mr. Horowitz, Inspector General of the Department of Justice.

COUNT VI

18 U.S.C. §1512 Relating to Tampering With A Witness, Victim,

1513 Relating To Retaliating Against A Witness, Victim

158.     Paragraphs 1- 157 are incorporated by reference as though fully set forth.

159.     County Officials, namely Jacqueline Brown, Vernon Herron, and David Leibowitz, by Ms. Brown's own admission, began an internal investigation into corrupt practices at the Prince George's County Health Department as early as April/May 2007.

160.     Ms. Clerkley's decisions also departed from The County's written policies and procedures.

161.     That, by David Leibowitz's own admission, it was his goal "to protect Gwen".

162.     Further, Prince George's County officials conspired to cover up the promises of payment Ms. Clerkley had made to the vendor, EMSystem, LLC. Ms. Clerkley and Mr. Leibowitz conspired to assuage the vendor by over paying the company for deficient work. Ms. Ogunsula states these conspiracies were illegal.

163.    Ms. Ogunsula became a target as a victim and witness after Ms. Clerkley's sudden

departure from her position at the Prince George's County Health Department in May 2007.

164.    Ms. Ogunsula was told by another co-worker that Ms. Clerkley took a framed picture that

belonged to Ms. Ogunsula when she packed up her office and suddenly moved her things out of

the Health Department's Largo, Maryland location in May 2007.

165.    A campaign to retaliate against Ms. Ogunsula began in June 2007.

166.    It also included not being paid in June/July 2007 for work she performed at The County

in support of the federal government program.

167.    The campaign also involved isolating Ms. Ogunsula from federal program team members

by telling her not to attend meetings.

168.    Ms. Ogunsula states that four young men in a green car showed up in her neighborhood

and parked near her house to stalk and watch her in July 2007. This campaign would later grow

and continue after she left employment with Prince George's County government.

169.    Further, Ms. Ogunsula states that when no deficiencies could be found in Ms. Ogunsula's

work, her managers and other County employees engaged in an extralegal campaign of falsehood

about her sexual orientation, her character, and mental health in order to defame her, discourage

her from being truthful about the program and negatively impact her future job prospects.

170.    Ms. Ogunsula alleges that public officials and employees of Prince George's County and

the State of Maryland viewed Ms. Ogunsula as a threat because she had been truthful about the

vendor's, EMSystem, LLC., performance and she had been sought out by other federal grantees

to discuss the details, findings, and management of the regional federal grant program in Prince

George's County Maryland.

171.    Ms. Ogunsula had demonstrated that she was not willing to perpetuate a pay-to-play

scheme or accept bribery of any kind from EMSystem, LLC. when she refused Andy

Nunemaker's inappropriate overtures and attempts to "negotiate" a resolution of the contract

dispute outside of the legally prescribed channels under the guidance of the County's Office of Law and Office of Central Services (Procurement).

172.     Ms. Ogunsula alleges that she was blacklisted for truthfully and faithfully executing her job and providing truthful testimony in two internal investigations about the PTS program. Further, Ms. Ogunsula alleges that because she knew and had records of the project details and billing of the program that she was a threat to County officials who wanted to conceal the billing and payments that had been made to the aforementioned vendor and the vendor's performance.

COUNT VII

42 U.S.C. § 1985 Conspiracy and Deprivation of Rights

Prince George's County Government, other defendants and Johns/Janes Doe

173.     Paragraphs 1- 172 are incorporated by reference as though fully set forth

174.     In furtherance of this 1985 conspiracy, Ms. Ogunsula states that The County Government in conjunction with other defendants and Johns/Janes Doe pursued and furthered an extralegal campaign for over seven years that involved blacklisting and retaliatory hiring in violation of the 14th Amendment and her right to "liberty and the pursuit of happiness". The aforementioned coding of the personnel document as "terminated", is a falsehood and key to the conspiracy. Further, in support of a blacklisting campaign, The County was untruthful about how and the reason she had left employment with them.

175.     Ms. Ogunsula also experienced the following:

     a.     Employment Blacklisting:          In violation of her Fourteenth Amendment rights, Ms. Ogunsula states in 84 months since leaving employment with Prince George's County Government that she has not been able to secure full-time work. She has applied for over 400 full-time positions in various companies in the Washington, D.C. area and throughout the U.S. Ms. Ogunsula has applied for various management levels, from administrative support to mid-level executives.

b. Ms. Ogunsula also applied for positions at various temporary agencies within the Washington, D.C. area, interviewed with them and was consistently told that they did not have positions that matched her skills (i.e., 4Staff and Telesec Corestaff of Washington, D.C.; Corestaff of Maryland)

c. Ms. Ogunsula contacted and successfully tested, sometimes achieving above average tests scores on office automation tests, at least five Temporary Staffing Agencies and was never sent on any assignments. She was consistently told every week when she called that they did not have any opportunities that matched her skills. More recently, she called the agencies 1-2 times a week, just about every week from July 2014-March 2015 and was consistently told that they did not have any opportunities that matched her skills. (Ms. Ogunsula is currently pursuing civil action against two of those agencies: Staffing Now, Inc. of Washington, DC and Contemporaries of Silver Spring, MD.)

d. Ms. Ogunsula sent her resume to 15 other staffing agencies and was consistently told that they did not have any opportunities that match her skills.

e. Central to the blacklisting conspiracy was the false coding of her Prince George's County Government personnel documents as terminated

176. Beginning in 2009 when Ms. Ogunsula began to prepare a federal complaint about the program and its results, she experienced police and witness intimidation. Ms. Ogunsula was targeted by police in incidences at the MSBA and University of Maryland Law School as she prepared the FCA complaint, as instructed by the FBI in 2009, and tried to obtain legal counsel.

177. She was put under surveillance and constantly followed as she traveled around the Washington DC metropolitan area. As the young lady at Bowie State said, "You can't fight all of the people watching you"

OGUNSULA VS. ERIC HOLDER ET AL. - 51

178.    Local police and prosecutors refused to take her complaints seriously regarding being followed, her porch light being broken repeatedly, her car being damaged, and her mail being stolen. There were times when Ms. Ogunsula felt unsafe in her own house.

179.    From the beginning of the unusual events in June 2008, Ms. Ogunsula was being intimidated and threatened in her neighborhood and community.

180.    Since the age of 17 when Ms. Ogunsula left foster care to attend undergraduate school at Howard University, where she earned a Bachelor of Business Administration degree in Marketing, Ms. Ogunsula has been her sole means of support. She has always worked to provide for her needs, food and shelter. Since leaving Prince George's County Government in 2008, Ms. Ogunsula has applied to well over 400 employment positions including temporary agencies within the Washington, D.C. metropolitan area. She has 4 letters of personal reference and recommendations including one from a former team member who worked for her on the PTS program at Prince George's County Government and additional recommendations on her LinkedIn profile. Ms. Ogunsula has diligently sought employment opportunities both within the Washington, D.C. metropolitan area and other parts of the country to no avail.

COUNT VIII

42 U.S.C. § 1983 Conspiracy and Deprivation of Rights

181.    Paragraphs 1- 180 are incorporated by reference as though fully set forth

182.    Ms. Ogunsula states that Prince George's County Government engaged in a Section 1983 Conspiracy under color of law to harm her.

a.    MacFayden & Friedman, the Substitute Trustees for Everhome Mortgage as well as Everhome Mortgage operating under color of law refused to be responsive to Ms. Ogunsula's request for information regarding the foreclosure of her home in 2010.

b.   Although MacFayden & Friedman had been unresponsive with regard to requests for information, Prince George's County Circuit Court refused to entertain any motions or grant a hearing to compel them to be responsive or hear any testimony about irregularities and extenuating circumstances regarding the foreclosure of Ms. Ogunsula's primary home in Bowie, Maryland. (2010-2011)

183.   In connection with the Vista Gardens Homeowners Association fees/debt, Ms. Ogunsula states that Judge Krystal Alves recused herself during the first hearing and then ruled on a subsequent motion hearing in April 2011. Ms. Ogunsula asserts that this was improper.

184.   In May through October of 2013, Prince George's County, specifically the Department of Social Services under color of law/statute, Ms. Stephanie Outlaw refused Ms. Ogunsula a benefit that was due her causing her to be without utilities (i.e., gas and electric) during the hottest time of year. Ms. Outlaw and her counterpart were unresponsive to Ms. Ogunsula calls and emails. This caused Ms. Ogunsula extreme physical and emotional distress.

COUNT IX

42 U.S.C. § 1983

Prince George's County Maryland Government, Fannie Mae, Mike Torrey, BWW Law Group, LLC.

185.   Paragraphs 1- 184 are incorporated by reference as though fully set forth.

186.   As set forth above and discussed more below, Prince George's County Maryland Government is a co-conspirator in Sections 1983 and 1985 conspiracies that violate Ms. Ogunsula's the First, Fourth, Fifth, Eighth, Thirteenth and Fourteenth Amendment. Everhome Mortgage was also a co-conspirator in the foreclosure actions against Ms. Ogunsula's home.

187.   Further, the manner in which Prince George's County handled the eviction of Ms. Ogunsula's home was retaliatory against Ms. Ogunsula as a whistleblower and for providing

information to federal law enforcement regarding civil rights violations, corruption, racketeering

activities and the 2001 sexual assault involving her. And therefore, the eviction was unlawful.

188.     Thus, Prince George's County (Sheriff Department), Fannie Mae and its agents, Michael

Torrey of Long and Foster and BWW Law Group, LLC performed an illegal eviction on April 9,

2015.

189.     They intentionally inflicted harm on Ms. Ogunsula by unlawfully evicting her and

without proper notice. And they caused her to be homeless and lose all of her possessions in an

unlawful eviction. Prince George's County Maryland Government, Fannie Mae and its agents

were negligent in responding to her requests for information and thus deprive her of her Fourth,

Fifth and Fourteenth Amendment rights.

190.     Veronica W. Ogunsula, on April 9, 2015 was evicted from her primary residence in

Bowie, Maryland, under color of state law, fraudulently and improperly as part of an on-going

conspiracy to divest Ms. Ogunsula of her property.

191.     Prince George's County Government (its agent--Sheriff), Fannie Mae and its agents,

Mike Torrey of Crofton, Maryland, and Geesing/BWW Law Group, LLC., did not provide proper

notification to the plaintiff regarding the eviction, its date, nor were they or their agents

reasonably responsive to the plaintiff requests for information in the days leading up to the

eviction.

192.     Ms. Ogunsula contacted Fannie Mae via their 800 number approximately 60 days before

the eviction to determine if they still owned the title to the Bowie property. She was told that

Fannie Mae was still the owners of the title.

193.     Further, Ms. Ogunsula was not given an opportunity to formally request a delay

regarding said eviction through the judicial process or a Show Cause Hearing. Prince George's

County Maryland Government and Fannie Mae, with fore knowledge, executed an eviction on

April 9, 2015 without proper notification. The defendants violated the plaintiff's Constitutional

rights to be free of unlawful warrants and seizures, to be afforded due process and equal protection under law.

194.    The Defendants, Prince George's County Government, was a co-conspirator in a Section 1985 claim in depriving Ms. Ogunsula equal protection under law to work and pursue her vocation and be secure in her home. In that they were a part of a conspiracy to prevent Ms. Ogunsula from being gainfully employed, demonstrated a deliberate indifference when Ms. Ogunsula reported to them interference with her right to be gainfully employed and earn an income that is in line with her experience and educational ability, they were complicit in a scheme to divest Ms. Ogunsula of her property in retaliation for her whistleblowing and providing information to federal authorities.

195.    Both federal and local law enforcement had prior written knowledge of an interference of Ms. Ogunsula's equal protection rights. Both were aware that Ms. Ogunsula was a victim/witness in a 2001 sexual assault case and had provided to federal law enforcement information regarding corruption and civil rights violations. Both federal and local law enforcement demonstrated a deliberate indifference for Ms. Ogunsula's safety and Constitutional rights.

196.    So the foreclosure and eviction was a Section 1983 deprivation of rights under color of law and improper.

197.    The Defendants, Fannie Mae and its agents did not use reasonable care when disposing of Ms. Ogunsula's belonging and tremendous damage resulted from their negligence and deliberate disregard for Ms. Ogunsula's property. As set forth above, Ms. Ogunsula had not been working and did not have the resources to move out of the house. She made Fannie Mae aware of this prior to and after the eviction.

198.    Fannie Mae did refer Ms. Ogunsula to their attorney, BWW Law Group, LLC., but BWW was not responsive to follow-up calls since their initial conversation. BWW Law Group called after the eviction began and said that Fannie Mae just denied (within 24 hours) the

extension. Mr. Torrey made a similar remark stating that he received an email or text to proceed with the foreclosure at 4:11 p.m. on April 9.

199.     Further, the defendants' action, left the plaintiff homeless and destitute as her monetary resources were inside of plaintiff's residence at 4723 Morning Glory Trail, Bowie, Maryland. Plaintiff made the defendant and its agent Mike Torrey aware of this information via two phone calls on April 9, 2015 and the defendants did not respond or provide any aid to plaintiff to prevent homelessness, lack of shelter or money. Further, the defendants mentioned above removed all of the plaintiff's furniture and belongings from the property during the eviction and left them on Vista Gardens Drive in the rain. The plaintiff's belongings included high value items such as a black baby grand piano, recording studio equipment (e.g., mixer, monitors, keyboards, digital recording equipment, etc.), bedroom furniture, televisions, clothes, and sentimental and invaluable pictures, personal papers and other keepsake items, etc.

200.     The plaintiff suffered pain, fear, anguish and distress with how the defendants handled the eviction, and their non-responsiveness to requests for information. The plaintiff, a victim of a violent crime, was left to fend for herself on the streets of Prince George's County Maryland and Washington, D.C. On April 9, after midnight, Ms. Ogunsula took shelter in a laundromat on Annapolis Road in New Carrollton, Maryland, not sleeping at all. During the course of the pre-dawn hours, a man came running off the street banging on the door, bloodied from a fight. The plaintiff did not have resources to provide for her shelter, food or clothing needs.

201.     Fannie Mae and its agent are co-conspirators with Prince George's County Maryland to harm Ms. Ogunsula for her providing truthful information to federal law enforcement regarding wrong-doing on a federal contract. Further, Ms. Ogunsula states that Prince George's County is a central figure in the conspiracy and retaliation against Ms. Ogunsula beginning most earnestly in 2008.

202.     The plaintiff was greatly distressed and is entitled to relief. Ms. Ogunsula claims damages and emergency declaratory and injunctive relief as set forth in the attached Emergency Order To Rescind and Vacate attached to this complaint.


COUNT X

42 U.S.C. § 1985 Conspiracy –

Church organizations, Greek-Letter Organizations; John Does; Jane Woes

203.     Paragraphs 1- 202 are incorporated by reference as though fully set forth.

204.     Ms. Ogunsula was harmed by an extralegal campaign to blacklist her for being conveniently perceived as "gay" and to accuse her of child abuse and criminally violate of her Fourth, Fifth, Eighth and Fourteenth Amendments. Church organizations were co-conspirators in a plan to punish Ms. Ogunsula through an extra legal campaign for exercise her 1st Amendment rights to express her religious beliefs and worship freely in the place of her choosing.  She was also further victimized because she provided truthful and accurate information to federal authorities regarding their campaign to oppress her and prevent her from working in the area of her field of study, experience and talent. Defendants from the organizations listed above, engaged in racketeering activities to benefit from Ms. Ogunsula's creative work without remuneration.

205.     Ms. Ogunsula was specifically targeted because of her race, skin color, and heritage. Also, Ms. Ogunsula because she does not have any "biological" family and has been her only means of support since she was seventeen and moved to Washington, D.C. to attend Howard University. Both federal and local law enforcement were aware of these violations and demonstrated a deliberate indifference. They failed to intercede to secure Ms. Ogunsula's rights.

206.     As previously stated, Ms. Ogunsula got a call from Pastor Bruce Clark Silver Spring, Maryland while she was in California on family business in April 2008. He wanted to tell her about a dream he had about her being in danger. In the dream, she went to the bank and

encountered some guys as she left who followed her and demanded money. He said that in her

dream, she threw some of the money at them, but the guys got more threatening and demanded all

of the money. He also advised her not to take a job that she would be offered. Approximately two

years before this, he had told Ms. Ogunsula that the Lord told him that she was to join his church

and be his Minister of Music.  Ms. Ogunsula had declined to become a member of Rev. Clark's

church and she just took note of his dream not really knowing what to make of it. However, this

phone call set the stage for a directed campaign to extort money and property from Ms. Ogunsula

207.      While attending the First Baptist of Glenarden Women's Retreat in Virginia Beach, VA

during April 23-25, 2008, Ms. Ogunsula disclosed to Patrice Carthern during a private prayer

service that she had been sexually assaulted in 2001 and molested as a child. She had never

shared this information with anyone except Crystal Scott, Lisa Owens, and her immediate family.

Ms. Ogunsula had an expectation that this information would be private. Ms. Ogunsula had been

invited to the retreat by the Women's Ministry under the leadership of Mrs. Trina Jenkins, wife of

Pastor John Jenkins, to provide musical accompaniment. After the prayer service, she was asked

to play for a reception. After she finished playing and when she returned to the room to get her

belongings, she ran into Ms. Jenkins who seemed like she wanted to talk. Ms. Ogunsula felt

uncomfortable so she walked away when someone else came up and started talking to Ms.

Jenkins.  She next encountered Ms. Renee Berkeley who asked her what seemed like a strange

question; she asked if Ms. Ogunsula had revealed everything when she was at the altar for the

prayer after the sermon. Ms. Ogunsula was very surprised by her question. It was like Ms. R.

Berkeley had been told what Ms. Ogunsula had said at the altar and she felt that Ms. Ogunsula

may have more to reveal.

208.      During the first week of June 2008, Ms. Ogunsula had a conversation with Ms. R.

Berkeley after everyone had left a music rehearsal for the Women's Ministry Praise Team at First

Baptist Church of Glenarden. Ms. Berkeley told her that someone at the County Government has

stated that she was gay. She is shocked by this statement and stated that she was not gay, nor had she ever been gay.

209.   Ms. Ogunsula was very concerned about Ms. R. Berkeley's comments. Not only were they false, but they could be used to greatly harm her reputation in the black church community.

210.   In 2009 – 2010, Ms. Ogunsula received no job offers though she made over approximately 150-200 applications and she received none to very few requests to provide musical accompaniment in church services.

211.   In 2011, as a musician on payroll at the St. Paul church Ms. Ogunsula ended up speaking with the Pastor regarding payroll arrangements and the consistent delay in receiving her paychecks (which was needed to pay her home mortgage) in a timely manner. During the conversation about the payroll/paycheck delivery with the Pastor and a Deacon Trustee, he questioned her ethnicity. In fact, he specifically asked her if I was Nigerian. Ms. Ogunsula felt this was inappropriate and was not germane to the needed to be paid in a timely manner.

212.   In 2012, Ms. Ogunsula was "let go" as musician at New Bethel Baptist Church in Washington, D.C without notice. The Minister of Music said that it was at the Pastor's request and his reason was due to the church's budget. I was concerned because Rev. Nutall had made comments in his sermon (on or about the 3rd or 4th Sunday) regarding what people post on Facebook. He spent several minutes talking specifically about Facebook statuses and what people say on Facebook. This part of the sermon caught her attention because I she had recently posted a blog on Facebook regarding the Chick Fil A CEO's comments about traditional marriage. Her comments were a call for for people to stop being intolerant of others' beliefs and a reminder of the rights guaranteed to all Americans by the Constitution. Ms. Ogunsula believed that this immediate firing was related to the blog she had written.

213.   Paul and Crystal Scott participated in a conspiracy with others that would falsely accuse to defame Ms. Ogunsula's character; perpetrate an extralegal campaign against her that included

blacklisting and psychological abuse; and extort property from Ms. Ogunsula and cause her both

emotional and psychological distress. Crystal Scott is a registered nurse and Paul Scott works for

the U.S. Department of Housing and Urban Development.

214.     The first week in June 2008, Crystal asked Ms. Ogunsula to come over to see their

youngest child off to school because she and Paul had to leave home early for meetings at work.

Ms. Ogunsula obliged. She was the Godmother of the oldest child and had spent a lot of time with

the Scotts as well as their children, together and separately. (Ms. Ogunsula was available to

provide childcare for the Scotts because she had recently left her employment with Prince

George's County Government on May 23, 2008). Crystal had wanted Ms. Ogunsula to spend the

night at her home, but Ms. Ogunsula elected to drive to her home in upper Montgomery County,

Maryland between 4-5 am on the day requested.

215.     As stated earlier, on the weekend of June 20, 2008, when it was bedtime, the Paul and

Crystal contacted their oldest son via telephone, directed him to take the youngest child to the

basement and for them to sleep together on the futon leaving their middle son to sleep in the

family room on the floor in his sleeping bag. In previous visits, all the kids had slept together. Ms.

Ogunsula slept on the futon in family room that night. When Crystal returned to pick up the kids,

they both took the children to a cancer event at Prince George's Community College. There Ms.

Ogunsula re-introduced Crystal to Ms. Leslie Johnson, former First Lady of Prince George's

County and wife of Jack Johnson and several other ladies who were participating in the TAKE

THE CHALLENGE program, a joint project between FOR THIS CAUSE, Inc. (the non-profit

organization Ms. Ogunsula led), Prince George's Community College, and Prince George's

County Health Department. During a later conversation that Ms. Ogunsula had with Crystal about

some of the events that had taken place during her employment with Prince George's County and

the fact that someone "supposedly from The County Government" had made a comment that she

was gay, Ms. Ogunsula remembers that Crystal had made a specific reference to the fact that

someone could say that she would abuse her daughter Victoria, but she would not believe this. Ms.

Ogunsula thought that this statement was strange for her to say because Ms. Ogunsula had spent

so much time with the children and had a close relationship with the family. She had known all of

the children since birth. Ms. Ogunsula felt the statement was awkwardly suggestive.

216.     In furtherance of the aforementioned conspiracy, Paul and Crystal Scott of Bethesda, MD,

Lisa Owens of Bowie, MD, Denise Strothers of Bowie, MD, and Donna M. Jones of North

Carolina requested to meet with Ms. Ogunsula in 2010 at her home in Bowie, Maryland under the

guise of determining what type of assistance they could provide to her. But instead of offering

assistance, their sole purpose was to get her to abandon her home.

217.     From the beginning of the unusual events in June 2008, that Ms. Ogunsula was being

intimidated and threatened in her neighborhood and community.


## COUNT XI

### 42 U.S.C. 1985—DETENTION; 42 U.S.C. 1994

218.     Paragraphs 1- 197are incorporated by reference as though fully set forth.

219.     From July 2008 to the present Ms. Ogunsula has been subject to an unlawful detention

and an extralegal campaign that was known to both federal and local law enforcement. These

actions were in violation of her Fourth, Fifth, Seventh, Eighth, Thirteenth and Fourteenth

Constitutional Amendment rights. This extralegal campaign began as a private conspiracy.

220.     The event with the Scott children in June 2008 began a malicious and extralegal

campaign involving being followed, unlawful surveillance, harassment and unusual events both

within the community where Ms. Ogunsula lived and the State of Maryland and Washington, D.C.

metropolitan area. The campaign also included police intimidation, blacklisting and "cointelpro"

type of tactics. With regard to employment, Ms. Ogunsula states that the defendants including the

members of local and federal law enforcement and their union members engaged in organized gang mobbing in order to cause her emotional distress, loss of income, and deprivation of her Constitutional Rights to life, liberty and the pursuit of happiness. The following is a list of the rights and Constitutional Amendments that were violated

c.   Due Process and False Imprisonment/Detention--Fifth Amendment

d.   Right To Sue—Seventh Amendment

e.   Cruel and Unusual punishment—Eighth Amendment

f.   Peonage—Thirteenth Amendment

g.   Equal Protection—Fourteenth Amendment

221.      Further law enforcement members who participated in this illegal campaign of organized stalking and blacklisting violated their oath of office and nationwide accepted global mission: "to protect and serve". Their behavior in this matter also further strengthens the belief that police see themselves as lawful organized gangs who have tremendous power to disobey the written laws of the United States and inflict injury and oppression on citizens and residents as long as they are sophisticated enough to not get caught. Their behavior throughout the seven years of this ordeal with few exceptions has been below par and in some cases illegal.

222.      Ms. Ogunsula states that members of the police unions in the Washington, D.C. area and the Fraternal Order of Police are also accountable for the extralegal campaign of stalking and mobbing.

223.      On information and belief, Bruce H. Clark of Silver Spring, MD, Prince George's County Police, members of the Fraternal Order of Police, Pastor John Jenkins and members of First Baptist Church of Glenarden, members of the Washington, D.C. Jurisdiction of the Church of God In Christ, Lisa A. Owens of Bowie, MD, Lynn Davenport of Forestville, MD, Vista Gardens Home Owners Association and its agents, Nagle & Zaller; Paul & Crystal Scott of Bethesda, MD, and various John and Jane Does, (some names are known and will be identified) jointly and

severally, conspired, pursued and/or directed a 1983 and 1985 conspiracies against Ms. Ogunsula's rights including blacklisting as well as an extralegal campaign to inflict emotional and mental distress as well as economic damage and oppression on Ms. Ogunsula and deprive her of her right to be free and secure in her home, pursue a vocation of her choosing, be paid for her creative works and labor in a competitive manner, and have the security of due process and equal protection under law.

224.     Defendants in this complaint participated, aided or abetted, or refuse to intercede to prevent Ms. Ogunsula being subjugated and prevented from pursuing a vocation of her choosing, being paid as a peon or begging for donations to support her livelihood, being discriminated against and excluded from work opportunities she was qualified for simply because of her she had provided information to federal law enforcement as a whistleblower. Additionally, her race, color and/or perceived sexuality were also factors.

225.     Certain of the individuals mentioned above as well representatives from the respective groups sought to subjugate Ms. Ogunsula and limit her ability to earn income from both her field of study as well as her talent as a musician.

226.     Although Ms. Ogunsula has an undergraduate degree from Howard University and a Masters of Business Administration degree with a 3.88 GPA from the University of Pittsburgh, certifications in federal marketing and procurement, more than 25 years of work experience in telecommunications, marketing and project management, she was blacklisted from working in her fields of study and experience.  Ms. Ogunsula has never been a suspect in any malfeasance or ethic violations.

227.     On information and belief, Ms. Ogunsula was the victim of racketeering and a conspiracy to benefit from her work and work products. Further, these individuals and companies subjected Ms. Ogunsula to peonage in that she was not fairly or even minimally compensated for her work.

228.     The conspiracy also involved putting Ms. Ogunsula in destitute circumstances so that she would have to sell or pawn her valuables including keepsake jewelry and recording/studio electronics for basic necessities and food.

## COUNT XII

### 42 U.S.C. 1983 CONSPIRACY; EQUAL PROTECTION; SEVENTH AMENDMENT CONSPIRACY

### 18 U.S.C. 1512, 1513 WITNESS INTIMIDATION

Greenbelt Police Department; Office of the State's Attorney's of Prince George's County

229.     Paragraphs 1- 228 are incorporated by reference as though fully set forth

230.     In October 2008, she initiated contact with the Greenbelt Police Department and eventually talked to Detective Mike Lanier about the 2001 sexual assault to see if a suspect had ever been identified. She was concerned because of the aforementioned incidents that had taken place in community where she lived including damage to her car in April 2008, the young guys in a green car who she had seen parked adjacent to her house and who had questioned a neighbor about her (2007), and Lisa Owens' (a college roommate and a resident of Bowie) comments about there being some type of problem with people in New Jersey.  She requested and received a copy of the sexual assault police report.

231.     Even in December 2009 when Detective Lanier telephoned Ms. Ogunsula to tell her that a suspect had been identified in the sexual assault case, he still had no explanation for the other events that had gone on that began in 2008 with the stalking, missing mail, and porch light being repeatedly broken, etc. Nor did the Prince George's County Office of the State's Attorney offer any explanation regarding the aforementioned incidents. There was a dismissive attitude by local and federal law enforcement that exacerbated the harassment that Ms. Ogunsula suffered and caused more emotional and mental distressed.

232.     On Tuesday, March 24, 2009, Ms. Ogunsula suffered intimidation and threat of arrest by the University of Maryland Police in Baltimore, Maryland for simply going to the MSBA building to request a referral for law firms/attorneys who could take on the False Claims complaint as well as employment/civil rights issues.

233.     Ms. Ogunsula also experienced another incident with University of Maryland at Baltimore Police at the Law School sometime later in 2009 when she left the Law Library to go to the Dean's Office to ask for contact information for the Dean of the Law School. Ms. Ogunsula previously had been working on her complaint to the FBI regarding the events/incidents that had taken place while she worked for Prince George's County Government. Police approached her and told her that she could not leave the Law Library. Ms. Ogunsula is a professional single black woman with an undergraduate and MBA, long-time Maryland resident, and a law-abiding citizen who has never been arrested or a suspect in any criminal activity.

234.     In the earlier March 2009 MSBA incident, she felt threatened by Officer Butler's escalation of anger and the threat of violence and arrest after being approached by law enforcement threatening for simply asking for information in a calm and non-threatening manner. She also perceived this behavior as some type of police intimidation and harassment.

235.     On March 26, two days after the police encounter in Baltimore, Maryland, Ms. Ogunsula's made a third attempt to report her stolen documents at the Barlowe Road location of Prince George's County Maryland Police. On her way into the station she noticed a single police officer standing behind his police car near the front of the building and as she walked by he opened his trunk and pointed to a black tire in his trunk. He was standing alone. Once inside the station, Officer Halsey, as mentioned earlier, stated that he would not be filing a report.

236.     On June 13, Ms. Ogunsula discovered a dead mouse in her house. The mouse was lying on sticky paper. At this time, she had owned her townhome for approximately six years and had never had a problem with rodents. The items and the rodent did not appear to be six years old.

Additionally, another mouse trap/poison was found in the basement. She had never purchased any of these items. She believes that the items were put there by someone else without her knowledge. She contacted the Prince George's County Police on the non-emergency number. The officers who responded discounted the incident and asked if she had problems with an old boyfriend. They did acknowledge that neither the trap nor the rodent looked six years old. Ms. Ogunsula's neighbor, Mr. C. Prandy, came over to assist her with removing the rodent.

## COUNT XIII

### 42 U.S.C. 1983 CONSPIRACY; FAILURE TO INTERCEDE

### Prince George's County Government; Office of the State's Attorney

237.    Paragraphs 1- 235 are incorporated by reference as though fully set forth.

238.    On January 7, 2010 Ms. Ogunsula met with then State's Attorney for Prince George's County, Glen Ivey, at his office in Upper Marlboro, MD. She provided him a copy of the False Claims Complaint (which now included Maryland States statues as well as Federal laws) that she had previously submitted to the FBI. She discussed the following:

- Claims she made against Prince George's County Government as incorporated in the False Claims Act submitted to the FBI in June of 2009;

- Specific information related to her feeling targeted and incidents (of a potential criminal nature) that took place in Prince George's County both during and after her employment with Prince George's County Government

- Her issue with not be able to secure employment after leaving Prince George's County Government. It had been nearly 18 months at this time.

- They also discussed facts related to a 2001 sexual assault that had taken place in Greenbelt, MD that was currently being prosecuted by the State's Attorney Office in Prince George's County.

Mr. Ivey reacted with surprise when Ms. Ogunsula provided to him a copy of a letter, dated 12-31-09, she had sent to U.S. Attorney General Eric Holder regarding criminal Civil Rights abuse in Prince George's County, MD and a request for his assistance. He told her that he would not move on the claims she presented to him about the Prince George's County procurement and corruption.

239.    Franklin Shelton, a prosecutor in the Prince George's County's Office of the State's Attorney, was responsible for the prosecution of John Henry Anderson for the October 2001 sexual assault of Ms. Ogunsula. Ms. Ogunsula tried to share with Mr. Shelton some of the things that had happened to her including the incident where four guys in a green car had been in her neighborhood asking questions about her, the missing mail, the problem with coming home after dark and her porch light being broken repeatedly, and the sense of being followed, etc. However, Mr. Shelton was dismissive.  Because Mr. Shelton was a member of First Baptist Church of Glenarden, and that church had been the place of some of the retaliatory acts related to the events that had taken place while she was employed with Prince George's County Government, she did not feel comfortable about giving Mr. Shelton additional information that would indicate that the sexual assault was not a random act. Ms. Ogunsula was also very reluctant to provide him with information regarding the date of the sexual assault and the comments made by Lisa Owens that Ms. Ogunsula had "done something to people in New Jersey". Mr. Shelton assured Ms. Ogunsula that John Henry Anderson was currently behind bars on other charges, but he wasn't willing to entertain any other reasons for the myriad of incidents that began in 2006 and 2007 and continued during their meeting in 2011.


COUNT XIV

42 U.S.C. 1983 – Failure To Intercede; Title 42 U.S.C., § 1986—Prince George's County

240.    Paragraphs 1-239 are incorporated by reference as though fully set forth.

OGUNSULA VS. ERIC HOLDER ET AL. - 67

241.     Accordingly, the Office of the State's Attorney, Ms. Alsobrooks, Mr. Shelton, and Ms. Brooks, had fore knowledge of conspiracies **listed under 1985**, and had power to prevent or aid in preventing the commission, but neglected or refused to intervene. In fact, Mr. Ivey, Mr. Shelton and Ms. Brooks had intimate knowledge of the type of incidences that Ms. Ogunsula was plagued with and refused to provide aid. Further, Mr. Shelton engaged in further victimization of Ms. Ogunsula by blaming her or discounting what she had experienced. Ms. Alsobrooks in her officially capacity as the Prince George's County State's Attorney, Mr. Shelton, Ms. Brooks and Prince George's County are liable to Ms. Ogunsula for all applicable damages.

242.     Ms. Ogunsula asserts that Mr. Shelton and the Prince George's County State's Attorney's Office was negligent in their investigative and administrative activities. Ms. Ogunsula further alleges that Mr. Shelton, and Ms. Alsobrooks did not exercise reasonable care regarding Ms. Ogunsula complaints or concerns with regard to her safety.

243.     Further, Ms. Ogunsula asserts that she had a "special relationship" with the Prince George's County Office of the State's Attorney as a witness in the sexual assault case and that they did not exercise reasonable care with regards to Ms. Ogunsula's safety or concerns. Further, by their conduct and under color of law all the aforementioned individuals deprived Ms. Ogunsula of her Fourth and Fourteenth Amendment rights.

244.     In May 2014, Ms. Ogunsula wrote a letter to the current Prince George's County State's Attorney Angela Alsobrooks regarding an incidence of being followed by at least two Hispanic young men. Ms. Alsobrooks never responded. Ms. Ogunsula had previously provided information to Ms. Renee Brooks and Mr. Franklin Shelton in meetings and conversations that took place between 2009 and 2011during the investigation and prosecution of the sexual assault case (State of Maryland vs. John Henry Anderson) about incidences where she felt she was being followed. These incidences did not cease after the John Anderson trial but continued.

COUNT XVI

42 U.S.C. 1986

245.        Paragraphs 1-244 are incorporated by reference as though fully set forth.

- ERIC H. HOLDER, JR., in his official capacity as U.S. Attorney General, Department of Justice, (DOJ)

- James B. Comey, in his official capacity as Director, Federal Bureau of Investigation, Washington, DC

- Thomas E. Perez, individually and in his official capacity as the former Assistant Attorney General, DOJ

- Marty Wilkinson, in his official capacity as the Director, U.S. Attorneys' Office, DOJ

- Michael E. Horowitz, in his official capacity as the Inspector General, (DOJ)

- Joseph S. Campbell, in his official capacity as the Deputy Assistant Director, Criminal Investigative Division, FBI

- Sandra A. Bungo, in her official capacity as the Unit Chief, Initial Processing Unit, Internal Investigations Section, Inspections Division, FBI. Sandra Bungo, is complicit in an extralegal campaign participated in by police that targeted Ms. Ogunsula, witness retaliation and obstructing justice.

- Rod Rosenstein, individually, U.S. Attorney for Maryland

- Thomas Coyle, individually, and as a FBI agent

- Stephen E. Vogt, individually, Special Agent in Charge, Baltimore Field Office, FBI

- Sharon Marcus-Kurn, individually, Deputy Chief, U.S. Attorney's Office for the District of Columbia

- David Abramowitz, Vice President, Humanity United

- Bryan E. Foreman, individually and in his official capacity as the former Assistant U.S. Attorney, Greenbelt Maryland

- Thomas Coyle, individually and in his official capacity as an Agent, FBI Baltimore

- Stephen E. Vogt, in his official capacity as the Special Agent In Charge, FBI Baltimore, Maryland

- Sharon Marcus-Kurn, U.S. Attorney's Office, Washington, D.C.

- Glen F. Ivey, former State's Attorney, Office of the State's Attorney's, Prince George's County, Maryland

- Angela Alsobrooks, State's Attorney, Office of the State's Attorney's, Prince George's County, Maryland

- Renee Battle Brooks, Office of the State's Attorney's, Prince George's County, Maryland

- Franklin Shelton, Office of the State's Attorney's, Prince George's County, Maryland

---

## DAMAGES

246.     As a direct and proximate result of the said acts and conduct of the defendants, Ms. Ogunsula suffered the following injuries and damages:

   a.   Violation of her rights under the First, Fourth, Fifth, Sixth, Seventh, Eighth, Thirteenth, and Fourteenth Amendments to the Constitution;

   b.   Loss of physical liberty;

   c.   The right to follow any of the common occupations of life

   d.   Pain and suffering, fear, and emotional abuse and distress; emotional trauma, which requiring the expenditure of money for treatment expected to last the rest of her life; and psychological *abuse*

e.   Economic damages including loss of income from salaries, wages, and investments and property; and

f.   Humiliation, embarrassment, and injury to reputation.

The physical, psychological, and economic consequences of the defendants' actions continue to date, and upon information and belief, will continue into the future.

WHEREFORE, plaintiff requests the following relief against all of the defendants:

a.   Award compensatory damages in an amount $10 million;

b.   Award punitive damages in an amount of $3.5million

c.   Injunctive relief including a rescission of foreclosure and stay of the eviction order; and

d.   Disbursements, costs, court fees, and attorneys' fees;

i

Dated this 22 of April, 2015.

Veronica W. Ogunsula
ProSe
4723 Morning Glory Trail
Bowie, Maryland 20720
240-486-1427

OGUNSULA VS. ERIC HOLDER ET AL. - 71

1

2   Eric H. Holder
    Attorney General
3   U.S. Department of Justice
    950 Pennsylvania Avenue NW
4   Washington, DC 20530-0001

5   Monty Wilkinson
    Director
6   Executive Office for the United States Attorneys
    U.S Department of Justice
7   950 Pennsylvania Avenue, NW
    Room 2242
8   Washington, DC 20530-0001

9
    James B. Comey
10  Director
    Federal Bureau of Investigation
11  935 Pennsylvania Avenue NW
    Washington, DC 20535-0001
12
    Thomas E. Perez
13  Former Assistant Attorney General
    Civil Rights Division
14  c/o
    Department of Labor
15  200 Constitution Avenue NW
    Washington, DC 20210
16
    H. Marshall Jarrett
17  Former Director
    U.S. Executive Office for the United States
18  Attorneys
    950 Pennsylvania Avenue, NW
19  Room 2242
    Washington, DC 20530-0001
20
    Michael E. Horowitz
21  Inspector General
    U. S. Department of Justice
22  Civil Rights & Civil Liberties Complaints
    Office of the Inspector General
23  950 Pennsylvania Avenue, N.W.
    Room 4706
24  Washington, D.C. 20530

25

26

27

28

Joseph S. Campbell
Deputy Assistant Director
Criminal Investigative Division
Federal Bureau of Investigation
935 Pennsylvania Avenue
Washington, DC 20535

Sandra A. Bungo
Unit Chief
Initial Processing Chief
Federal Bureau of Investigation
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20535-0001

Bryan E. Foreman
Assistant U.S Attorney
District of Maryland
U.S Courthouse, Suite 400
6500 Cherrywood Lane
Greenbelt, Maryland 20770-1249

Stephen E. Vogt
Special Agent In Charge
Federal Bureau of Investigation
2600 Lord Baltimore Drive
Baltimore, Maryland 21244

Thomas Coyle
Agent
Federal Bureau of Investigation
2600 Lord Baltimore Drive
Baltimore, Maryland 21244

Sharon Marcus-Kurn
Deputy Chief
U.S. Attorney's Office
for the District of Columbia
555 Fourth Street N.W.
Washington, DC  20001

OGUNSULA VS. ERIC HOLDER ET AL. - 72

1

Angela Alsobrooks
State's Attorney

2

Office of the State's Attorney
Prince George's County

3

Courthouse
Room 349M

4

14735 Main Street
Upper Marlboro, MD 20772

5

6

Franklin Shelton
Prosecutor

7

Office of the State's Attorney
Prince George's County

8

Courthouse
Room 349M

9

14735 Main Street
Upper Marlboro, MD 20772

10

11

Renee Battle Brooks
Assistant State's Attorney

12

Office of the State's Attorney
Prince George's County

13

Courthouse
Room 349M

14

14735 Main Street
Upper Marlboro, MD 20772

15

16

Mark Magaw
Chief of Police

17

7600 Barlowe Road
Landover, MD 20785

18

19

Michael Lanier, Detective
Greenbelt Police Department

20

550 Crescent Road
Greenbelt, MD  20770

21

22

Jim Pasco,
Executive Dictor

23

Fraternal Order of Police,
National Headquarters,

24

701 Marriott Drive,
Nashville, TN, 37214

25

26

Vernon R. Herron
500 W. Baltimore Street

27

Baltimore, MD 21201

28

OGUNSULA VS. ERIC HOLDER ET AL. - 73

Gwen Clerkley
Prince George's County Maryland Government
c/o
Office of Law
County Administration Building
14741 Governor Oden Bowie Drive
Room5121
Upper Marlboro, Maryland 20772-3050

Prince George's County Health Department
c/o
Office of Law
County Administration Building
14741 Governor Oden Bowie Drive
Room5121
Upper Marlboro, Maryland 20772-3050

Derrick Nutall
Pastor
New Bethel Baptist
1739 Ninth Streeet NW
Washington, DC 20001

Glen F. Ivey
Leftwich & Ludaway
1400 K Street NW
#1000
Washington, DC 20005

Paul A. Scott
Crystal Scott
c/o
U.S. Department of Housing and Urban
Development
451 7th Street SW
Washington, DC 20410

Lisa A. Owens
4600 Deepwood Court
Bowie, Maryland 20720

Bruce H. Clark

John K Jenkins
Pastor
First Baptist Church of Glenarden
3600 Landover Road
Landover, Maryland 20785

Rev. Robert J. Williams

St. Paul Baptist Church
6615 Walker Mill Road
Capital Heights, Maryland 20743

Bishop Neavelle Cole
Jurisdictional Bishop
New Bethel Church of God In Christ
6440 Piney Branch Road  NW
Washington, DC  20012

_____
Homeland Security and Governmental Affairs
Committee
340 Dirksen Senate Office Building
Washington, DC 20510

Joi Cianci
Fannie Mae
3900 Wisconsin Avenue  NW
Washington, DC 20016

Mike Torrey
Long and Foster
1121 Simsbury Ct #53F
Crofton, Maryland 21114

Long and Foster
2191 Defense Highway, Suite 120
Crofton, Maryland 21114

BWW Law Group
6003 Executive Blvd, Suite 101
Rockville, Maryland 20852

Lynn Davenport
7008 Whitney Avenue
Forestville, Maryland 20747

Mr. Joseph A. Thompson
5624 Old Temple Hill Road
Temple Hills, Maryland 20748

OGUNSULA VS. ERIC HOLDER ET AL. - 74